United States Court of Appeals,

Eleventh Circuit.

Nos. 90-6020, 91-5743 and 94-4354.

UNITED STATES of America, Plaintiff-Appellee,

v.

Alberto CALDERON, Sigfried Noa a.k.a. "Oro", Pablo Luis Martinez, Jr., a.k.a. "Tatico", Manuel Iglesias, a.k.a. "Albaro Perez", a.k.a. "Manolo", Rene Manuel Gamboa, Jose Abella, a.k.a. "Toto", Juan Vincent Caderno, Luis R. Garcia, Defendants-Appellants.

UNITED STATES of America, Plaintiff-Appellee,

v.

Pablo Luis MARTINEZ, Jr., Rene Manuel Gamboa, Alberto Calderon, Jose Abella, Manuel Iglesias, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Pablo Luis MARTINEZ, Jr., a.k.a. "Tatico", Defendant-Appellant.

Nov. 14, 1997.

Appeals from the United States District Court for the Southern District of Florida. (No.89-10040-Cr), James Lawrence King, Judge.

Before EDMONDSON and BIRCH, Circuit Judges, and FOREMAN[*], Senior District Judge.

FOREMAN, Senior District Judge:

In this consolidated appeal, eight appellants appeal their convictions for various narcotics offenses arising from the importation of more than 1,300 kilograms of cocaine aboard the 38-foot cabin cruiser named *What's Up.* We affirm.

I. Background

On September 14, 1988, Customs Agent Richard Johnson received a tip that a suspicious vessel named *What's Up* was being towed into Tortola Marina in Key Largo, Florida. Agent Johnson learned that the *What's Up* had been previously sighted in the Bahamas and had failed to

---

[*]Honorable James L. Foreman, Senior U.S. District Judge for the Southern District of Illinois, sitting by designation.

report its arrival into the United States in violation of United States law. Agent Johnson and other Customs personnel maintained constant visual surveillance of the boat until September 17, when a search of the boat revealed the presence of a large quantity of cocaine in hidden compartments in the boat's cabin. Subsequently, appellants and others were arrested and indicted on various charges including conspiracy to import and distribute cocaine from the Bahamas. Further investigation revealed that on three different occasions in the summer of 1988, cocaine was smuggled into the United States aboard the *What's Up.* Appellants participated in the importation and distribution conspiracy in different roles and, in some cases, at different times.

The case proceeded to trial before Judge James Lawrence King. Judge King presided over all phases of the trial with the exception of a portion of the jury's deliberations and the return of the verdicts. Those portions were presided over by Judge Thomas E. Scott. On May 21, 1990, the jury returned its verdict finding Abella guilty as to Counts I and VII; Caderno guilty as to Counts I, II, VII and VIII; Calderon guilty as to Counts I-VI; Gamboa guilty as to Counts II and VI; Garcia guilty as to Counts I, II, III, and IV; Iglesias guilty as to Counts I, II, VIII, and IX; Martinez guilty as to Counts I, II and VIII; and Noa guilty as to Counts I, II, IV, VI, VII and VIII. Appellants were sentenced to terms of imprisonment ranging from 188 months to 336 months. We will discuss the facts relevant to appellants' claims in greater detail in conjunction with our discussion of each of their assertions of error.

II. Sufficiency of the Evidence

Abella, Calderon, and Garcia contend that the evidence presented by the government was insufficient to sustain their convictions. More specifically, all three of them attack the credibility of the coconspirator witnesses, Harold Garcia, Rolando Alvarez, and Sisinio Torres, who testified against them. Abella and Garcia further assert that the evidence adduced at trial merely establishes their presence or association with the co-conspirators, not the knowing participation required to support a conspiracy conviction, and thus was insufficient to impose conspiratorial liability. Finally, Calderon claims that the evidence presented proved three separate conspiracies, not a single

2

conspiracy as charged in the indictment and that Calderon was prejudiced by that variance. In response, the government argues that determination of witness credibility is the sole province of the jury, that as to each of the appellants the evidence proved sufficient knowing participation in the conspiracy, and that the evidence did in fact establish a single conspiracy to import and distribute three loads of cocaine between June and September, 1988.

Whether the record contains sufficient evidence to support the jury's verdict is a question of law that we review *de novo. United States v. Harris,* 20 F.3d 445, 452 (11th Cir.1994). Although the Court conducts its review without special deference to the district court, the evidence is viewed in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor. *Id.; See also, Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Johnson,* 713 F.2d 654, 661 (11th Cir.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). The verdict must stand if their is substantial evidence to support it, that is "unless no trier of fact could have found guilt beyond a reasonable doubt." *United States v. Battle,* 892 F.2d 992, 998 (11th Cir.1990).

> It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. A jury is free to choose among the constructions of the evidence.

*United States v. Hardy,* 895 F.2d 1331, 1334 (11th Cir.1990) (quoting *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)).[1] If, however, the record reveals a lack of substantial evidence from which a fact finder could find guilt beyond a reasonable doubt, we must reverse the defendant's conviction. *Kelly,* 888 F.2d at 740. We apply these general standards in reviewing each of appellants' sufficiency claims.

A. Credibility

---

[1] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), this Court adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Appellants first argue that the witnesses who testified against them were inherently incredible and, because their testimony represented the only evidence linking them to the charged crimes, that testimonial evidence was insufficient to establish their guilt beyond a reasonable doubt. Garcia contends that Sisino Torres had multiple prior convictions and admitted that his entire testimony in at least one of these earlier cases was untruthful. Abella contends that Harold Garcia has long been involved in drug smuggling, lied on his income tax return, sought and received extensive immunity from the government for himself and his wife despite the government's knowledge their misdeeds, and admittedly "would lie to save himself." Abella also claims that Rolando Alvarez was both a cocaine dealer and user, also received immunity for himself and his family, was seeking a sentence reduction, has been accused of insurance fraud, and repeatedly lied to law enforcement agents. Calderon adopts Abella's and Garcia's characterizations of these witnesses.

It is well established that "[c]redibility determinations are the exclusive province of the jury." *United States v. Parrado,* 911 F.2d 1567, 1571 (11th Cir.1990), *cert. denied,* 498 U.S. 1104, 111 S.Ct. 1005, 112 L.Ed.2d 1088 (1991); *See also United States v. Copeland,* 20 F.3d 412, 413 (11th Cir.1994); *United States v. Billue,* 994 F.2d 1562, 1565 (11th Cir.1993), *cert. denied,* 510 U.S. 1099, 114 S.Ct. 939, 127 L.Ed.2d 230 (1994); *United States v. Hewitt,* 663 F.2d 1381 (1981). *Hewitt* is particularly applicable to the case before us. Therein, the appellant attacked the sufficiency of the evidence underlying his conviction for aiding and abetting the use of an explosive to commit a felony based upon the fact that it rested in large part on the testimony of two convicted felons testifying with immunity. *Hewitt,* 663 F.2d at 1385. In rejecting appellant's argument, we stated that a judgment of acquittal

> is not required because the government's case includes testimony by "an array of scoundrels, liars and brigands." The jury was free to disbelieve the [ ] government witnesses whose faults were exhaustively catalogued by the attorney[s].... Furthermore, the trial judge fully instructed the jury on the degree of suspicion they should entertain when considering the testimony of accomplices who testify with immunity. By bringing back a verdict of guilty, however, the jury found that the testimony of [the witnesses] was credible. Because the testimony was not incredible as a matter of law, we must accept this determination by the jury.

4

*Id.* at 1385-86 (citations omitted); *See also United States v. Rivera,* 775 F.2d 1559, 1561 (11th Cir.1985), *cert. denied,* 475 U.S. 1051, 106 S.Ct. 1275, 89 L.Ed.2d 582 (1986). "For testimony of a government witness to be incredible as a matter of law, it must be "unbelievable on its face.' " *Rivera,* 775 F.2d at 1561 (11th Cir.1985) (quoting *United States v. Cravero,* 530 F.2d 666, 670 (5th Cir.1976)). It must be testimony as to " "facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature.' " *Rivera,* 775 F.2d at 1561 (quoting *Cravero,* 530 F.2d at 670). Further, " "the fact that [the witness] has consistently lied in the past, engaged in various criminal activities, [and] thought that his testimony would benefit him ... does not make his testimony incredible.' " *Id.*

Applying these well established standards to this case, it is evident that appellants' credibility challenges must fail. A review of the record reveals that the issues of the witnesses' prior convictions, drug activity, status as cooperating witnesses, and capacity for truthfulness were thoroughly explored on both direct and cross-examination. Moreover, the district judge fully instructed the jury regarding the credibility of such witnesses. By their verdict, the jury determined, albeit implicitly, that the testimony those witnesses gave was credible. Finally, it is clear that their testimony implicating appellants in this drug conspiracy was not "incredible as a matter of law" as this circuit has defined that phrase and, thus, the jury's credibility determination will not be disturbed. Accordingly, we find that the testimony was sufficient to allow the jury to find appellants guilty of the charges against them beyond a reasonable doubt.

B. Conspiracy Counts[2]

Abella and Garcia also argue that the evidence, even if credible, merely established their presence or association with the other conspirators rather than the knowing participation that they correctly assert is required for their respective conspiracy convictions under 21 U.S.C. § 963

---

[2]The court notes that appellants' sufficiency arguments in this regard, as well as Calderon's argument that the evidence presented against him at trial varied from the charges contained in the indictment which we address in the following section, relate only to appellants' respective conspiracy convictions, not to their convictions on the substantive counts.

(conspiracy to import cocaine) and 18 U.S.C. § 846 (conspiracy to possess with intent to distribute cocaine). "To support [a] conviction for conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, the government must prove beyond a reasonable doubt that: (1) a conspiracy existed; (2) appellants knew of the essential objectives of the conspiracy; and (3) appellants knowingly and voluntarily participated in the conspiracy." *Harris,* 20 F.3d at 452 (citing *United States v. Andrews,* 953 F.2d 1312, 1318 (11th Cir.1992), *cert. denied sub nom. Sharp v. United States,* 505 U.S. 1210, 112 S.Ct. 3007, 120 L.Ed.2d 882 (1992)). Similarly, "[u]nder 21 U.S.C. § 963, the government must prove that the appellants agreed to import narcotics into the United States and knowingly and voluntarily participated in the agreement." *United States v. Obregon,* 893 F.2d 1307, 1311 (11th Cir.), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990).

Appellants do not contend that the government failed to establish that a conspiracy existed between some or all of the other appellants in this case, but rather limit their argument to whether the government proved that they were knowing and voluntary participants therein. Accordingly, that is the area to which our inquiry is limited. To prove knowing and voluntary participation, the government must prove beyond a reasonable doubt that appellants had a specific intent to join the conspiracy. *Harris,* 20 F.3d at 452. (citing *United States v. Jenkins,* 779 F.2d 606, 609 (11th Cir.1986)). However, we are further guided by the fact that "[o]nce the government establishes the existence of the underlying conspiracy, [ ] it only needs to come forward with slight evidence to connect a particular defendant to the conspiracy." *Id.* (citing *United States v. Gates,* 967 F.2d 497, 499 (11th Cir.), *cert. denied sub nom. Burley v. United States,* 506 U.S. 1011, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992)). We have described this as a "minimal threshold" that may be passed on either direct or circumstantial evidence. *Id.* Further, the conclusion that appellants had a common purpose and plan with the other coconspirators may be inferred from a "development and collocation of circumstances." *United States v. Lyons,* 53 F.3d 1198, 1201 (11th Cir.) (quoting *Glasser,* 315 U.S. at 80, 62 S.Ct. at 469) (internal quotation marks omitted), *cert. denied sub nom. Price v. United States,* --- U.S. ----, 116 S.Ct. 262, 133 L.Ed.2d 185 (1995). One of those circumstances is repeated

6

presence at the scene of the drug trafficking. That circumstance standing alone can give rise to a permissible inference of participation in the conspiracy. *Id.* While not sufficient in and of itself to convict, the inference is "a material and probative factor that the jury may consider in reaching its verdict." *Id.* (quoting *United States v. Iglesias,* 915 F.2d 1524, 1527 (11th Cir.1990) (internal quotation marks omitted)). Finally, it is clear that one may be found guilty of participating a conspiracy even though his role is minor in the overall scheme. *Obregon,* 893 F.2d at 1311.

In this case, it is evident that the government surpassed the "minimal threshold." As to Abella, the government presented evidence he used his skill as a diesel mechanic to ready the *What's Up* on each of the three occasions it set sail to the Bahamas to pick up its illicit cargo, assisted in loading the third load of cocaine into secret compartments on the *What's Up* in the Bahamas, made arrangements to secure a trailer in the Keys to store that cocaine after it arrived, and traveled to the Keys to participate in off loading the cocaine (although this part of the plan was thwarted when the *What's Up* ran aground). As to Garcia, the government presented evidence that he captained the *What's Up* on its first voyage to the Bahamas to pick up and return 325-350 kilograms of cocaine to the United States. He was paid $150,000 for his integral role which, as the government points out, was a princely sum for only a few days work. Without a doubt, that suggests that the trip involved drugs. As we have stated, " "[a] conspiracy conviction will be upheld ... when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." *Parrado,* 911 F.2d at 1570 (quoting *United States v. Figueroa,* 720 F.2d 1239, 1246 (11th Cir.1983)).

> [T]he task of determining the sufficiency of the evidence is not aided by the ritualistic invocation of the "mere presence" rubric. Rather it requires an examination of all of the proved circumstances, including presence, to determine whether from them a reasonable jury could infer and find beyond a reasonable doubt knowing and intentional participation.

*Id.* (quoting *United States v. Cruz-Valdez,* 773 F.2d 1541, 1545 (11th Cir.1985) (en banc) (internal quotation marks omitted), *cert. denied sub nom., Ariza-Fuentas v. United States,* 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986)). It could and did.

C. Variance

Calderon argues that his conspiracy convictions must be set aside because the evidence presented trial established three separate conspiracies involving each of the three trips to the Bahamas rather than only a single conspiracy as charged in the indictment and, further, that this variance was prejudicial. The analytical framework for our analysis of Calderon's assertions is straightforward and derived from well established precedent. We will not reverse convictions based on a variance unless that variance was: (1) material; and (2) substantially prejudicial to the defendant. *United States v. Coy,* 19 F.3d 629, 632 (11th Cir.) (citing *United States v. Reed,* 980 F.2d 1568, 1581 (11th Cir.1993), *cert. denied,* 509 U.S. 932, 113 S.Ct. 3063, 125 L.Ed.2d 745 (1993)), *cert. denied,* 513 U.S. 1006, 115 S.Ct. 525, 130 L.Ed.2d 429 (1994). Thus, a two step inquiry is required. First, viewing the evidence in the light most favorable to the government as we must do in all sufficiency claims, we ask whether a reasonable jury could have determined beyond a reasonable doubt that a single conspiracy existed. *Id.* (citing *United States v. Caporale,* 806 F.2d 1487, 1500 (11th Cir.1986), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987)). Thus, the jury makes the initial determination of whether the evidence supports a single conspiracy and their determination will not be disturbed if supported by substantial evidence. Second, if it is determined that there is a material variance, we then determine whether any substantial prejudice resulted to the defendants if more than one conspiracy did in fact exist. *Id.* From reviewing the evidence in the proper light, we conclude that there was substantial evidence such that a reasonable jury could have determined beyond a reasonable doubt that a single conspiracy to import and distribute cocaine, of which Calderon was a member, existed.

In determining whether the jury could have found a single conspiracy, we consider: (1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants. *Coy,* 19 F.3d at 633; *See also United States v. LaSpesa,* 956 F.2d 1027, 1031 (11th Cir.1992); *United States v. Khoury,* 901 F.2d 948, 956 (11th Cir.1990). First, a common goal, that of cocaine importation and distribution, existed in this case. As we have repeatedly stated, " "common' for the purposes of this test means "similar' or "substantially the same' rather than "shared'

8

or "coordinate.' " *Coy,* 19 F.3d at 633. (citing *United States v. Adams,* 1 F.3d 1566, 1584 (11th Cir.1993), *cert. denied,* 510 U.S. 1198, 114 S.Ct. 1310, 127 L.Ed.2d 660 (1994) ("common goal" inquiry satisfied by the common crime of conspirators: importation of marijuana); *LaSpesa,* 956 F.2d at 1031 (same: fraud); *United States v. Jones,* 913 F.2d 1552, 1561 (11th Cir.1990) (same: distribution of cocaine); *Khoury,* 901 F.2d at 956 (same: importation of methaqualone)). Second, the nature of the underlying scheme was the same. The three loads of cocaine were smuggled into the Keys from the Bahamas aboard the same vessel, in the same hidden compartments, in essentially the same manner and over a relatively short period of time. *See Khoury,* 901 F.2d at 957. Thirdly, and finally, there was extensive overlap of the participants. The jury was presented with evidence that Blas Duran, Harold Garcia, Sisinio Torres, Jose Abella, and Sigfriedo Noa played critical roles in the smuggling operation on each of the three occasions. The evidence showed that Calderon himself was involved with the first two loads. Thus, taking the evidence in the light most favorable to the government, there were at least five overlapping participants which we believe, based on our precedents, is a sufficient showing under this prong of the variance test. *See LaSpesa,* 956 F.2d 1027 (overlap of one coconspirator sufficient); *see also Khoury,* 901 F.2d 948 (overlap of two sufficient); *United States v. Stitzer,* 785 F.2d 1506, 1518 (11th Cir.) (overlap of common distributor sufficient to support finding that five separate "cluster" conspiracies were part of one conspiracy), *cert. denied sub nom., Perna v. United States,* 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 44 (1986).

Our finding that there was sufficient evidence for the jury to conclude that the actions of Calderon and the other appellants constituted a single conspiracy ends our variance inquiry. We note, however, that even if we had come to the opposite conclusion, it would have been incumbent upon Calderon to demonstrate that his substantial rights were prejudiced by the variance. *Caporale,* 806 F.2d at 1500. This he has not done. To demonstrate such prejudice, appellant must show: 1) that the proof at trial differed so greatly from the charges that appellant was unfairly surprised and was unable to prepare an adequate defense; or 2) that there are so many defendants and separate conspiracies before the jury that there is a substantial likelihood that the jury transferred proof of

9

one conspiracy to a defendant involved in another. *Coy,* 19 F.3d at 634; *Caporale,* 806 F.2d at 1500. First, Calderon does not contend he was unfairly surprised. Had the indictment charged separate conspiracies, it is unlikely that the defense at trial would have varied because, in either event, the underlying crimes charged and elements of proof would have been identical. *Coy,* 19 F.3d at 634. Second, this case did not present an overly complex factual situation where the danger of jury confusion existed. *See Caporale,* 806 F.2d at 1501 ("case involving eleven defendants and two possible conspiracies [was] not so complex by definition that the jury will be unable to segregate the evidence properly."); *see also Coy,* 19 F.3d at 635. Further, the jury's verdicts demonstrates that it was not confused by the evidence. Abella and Gamboa were found not guilty of at least one of the conspiracy charges brought against them. This shows that the jury was able to sift through the evidence and thoughtfully assign conspiratorial liability on an individual basis. *Caporale,* 806 F.2d at 1501.

Thus, we find that appellants' various sufficiency challenges must fail. Our review of the record convinces us that substantial evidence from which a reasonable jury could find each appellant guilty beyond a reasonable doubt exists.

III. Multiple Conspiracy Instruction

In a related, but somewhat different argument than Calderon's variance claim, appellants all contend that the district judge erred in refusing to give the jury a multiple conspiracy instruction.[3] They argue that the evidence presented at trial showed three separate conspiracies corresponding to each of the three loads of cocaine based upon the fact that the participants in each load were not identical. Eleventh Circuit Pattern Jury Instruction 4.3, Multiple Conspiracies, was tendered to the trial court by counsel for co-defendant Margarita De Orovio. The government objected citing the nearly identical scheme, common leader, and the extensive overlap of participants that was shown by the evidence. During the ensuing oral argument, counsel for Appellant Martinez joined in urging

---

[3]Originally, Abella and Garcia were the only parties to argue that the district judge's refusal to give the tendered instruction was erroneous. The remaining appellants have since filed supplemental briefs wherein they join in Abella's and Garcia's assertions of error.

10

the district judge to give that instruction over the government's objection. After hearing argument, the district judge sustained the government's objection. Under the rules adopted at the outset of this trial, any motion made by one counsel was assumed to have been adopted by all defendants, unless one or more specifically opted out. Thus, we will treat the instruction as having been tendered by all defendants.

Generally, a multiple conspiracy instruction is required where

the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates that a jury could *reasonably conclude* that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment.

*United States v. Laetividal-Gonzalez,* 939 F.2d 1455, 1465 (11th Cir.1991) (emphasis added) (citing *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), *cert. denied sub nom., Ocampo v. United States,* 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 505 (1992)). Thus, this claim varies from Calderon's variance claim in that there the question was whether a reasonable jury could have concluded beyond a reasonable doubt that a single conspiracy existed. Here, on the other hand, the issue to be resolved is whether that same jury could also have reasonably concluded from the evidence that multiple conspiracies, rather than the single charged conspiracy, existed. The answer to the former does not necessarily dictate the answer to the latter. *See United States v. Stowell,* 947 F.2d 1251 (5th Cir.1991), *cert. denied,* 503 U.S. 908, 112 S.Ct. 1269, 117 L.Ed.2d 497.

"The issue of whether the defense produced sufficient evidence to sustain a particular instruction such as a multiple conspiracy instruction, is generally a question of law subject to de novo review." *United States v. Maza,* 93 F.3d 1390, 1399 (8th Cir.1996). It is not, of course, required if the evidence only supports a finding of a single conspiracy as charged. *Id.; See also, United States v. Tipton,* 90 F.3d 861, 883 (4th Cir.1996). Thus, the evidence presented at trial must sufficiently support the tendered instruction. *Maza,* 93 F.3d at 1399 (holding that record did not sufficiently support defendants' multiple conspiracy theory); *See also Tipton,* 90 F.3d at 883 (same). To find that the evidence established a single conspiracy "it is not necessary for each conspirator to

11

participate in every phase of the criminal venture, provided there is assent to contribute to a common enterprise." *United States v. Ghazaleh,* 58 F.3d 240, 244-45 (6th Cir.1995) (internal quotation marks omitted), *cert. denied,* --- U.S. ----, 116 S.Ct. 716, 133 L.Ed.2d 669 (1996). "It is often possible, especially with drug conspiracies, to divide a single conspiracy into sub-agreements.... This does not, however, mean that more than one conspiracy exists. The key is to determine whether the different sub-groups are acting in furtherance of one overarching plan." *Id.* (citations omitted). Finally,

> [t]he fact that various defendants entered the conspiracy at different times[,] ... performed different functions[, and] ... participated in numerous separate transactions does not convert a single conspiracy to multiple conspiracies. Furthermore, the fact that coconspirator may change roles in the conspiracy or even depart from the conspiracy may signal only that the single conspiracy has moved to a new phase.

*Maza,* 93 F.3d at 1399 (citations omitted).

After careful review, we conclude that the record does not sufficiently support appellant's theory of multiple conspiracies to warrant the requested instruction; rather the evidence, as the jury implicitly determined, shows a single overarching conspiracy to import and distribute cocaine from the Bahamas. As detailed above in our review of Calderon's variance claim, the evidence presented to the jury showed a common scheme, that of cocaine importation and distribution, undertaken under the leadership of Blas Duran by an overlapping group of participants. The importation was accomplished over a relatively short amount of time, aboard the same vessel, in the same manner, and from the same supplier. As the above cited cases demonstrate, the mere fact that some participated in this load, but not that one, or that their areas of responsibility changed from one load to another, does not mean that this single conspiracy was transformed into multiple ones. Some participants may very well have joined the conspiracy for the duration of only one or two loads, but that does not change the fact that what they joined was a single conspiracy with a common objective headed by Blas Duran. Our review convinces us that the only reasonable conclusion to be drawn from the evidence presented is that the conspiracy that existed in this case was, as charged by the government, a single conspiracy to import and distribute cocaine.

12

In addition, the instructions given by the judge adequately informed the jury that in order to convict, it must find that each appellant joined in *the* conspiracy charged. The instructions given included the following:

> What the evidence in the case *must* show beyond a reasonable doubt is: *First:* That two or more persons in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, *as charged in the indictment;* and *Second:* That each defendant knowingly and willfully became a member of *such a conspiracy ....* So, if a defendant has an understanding of the unlawful nature of a plan and knowingly and willfully *joins in that plan* on one occasion, that is sufficient to convict him for conspiracy even though he had not participated before and even though he played only a minor role ... Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one, does not thereby become a conspirator.

R.2: Doc. 227 at 10 (emphasis added). In light of the evidence presented, the language of this instruction was sufficient to inform the jury that it could convict only if the government proved that each defendant was a member of the conspiracy alleged in the indictment and not any other. Thus, we find no reversible error in the district judge's refusal to give the tendered instruction.

We are further persuaded of the correctness of our conclusion by that fact that, even assuming that such an instruction was warranted, in order to succeed in such a challenge, appellants must show that they were substantially prejudiced by the refusal to give the instruction. *Tipton,* 90 F.3d at 883. To find such prejudice, we would have to conclude that the evidence of multiple conspiracies was so strong that the jury would probably have acquitted appellants of the conspiracy charges had it been given the tendered instruction. *Id.* After careful review of the evidence presented against each appellant, that is something of which we are certainly not persuaded.

IV. Evidence of Prior Kidnaping Conviction

Iglesias challenges the admission of evidence regarding his prior conviction for kidnaping and marijuana trafficking pursuant to Federal Rule of Evidence 404(b). The trial judge admitted the evidence for the limited purpose of establishing Iglesias' intent to commit the charged crimes which he found had been put in issue by Iglesias' not guilty plea and by his defense that he was merely present at the scene of the drug activity in order to give his brother, Jose Iglesias, a ride. Iglesias first contends that the prior kidnaping conviction was improperly admitted because there was no

13

logical connection between the states of mind required for kidnaping on the one hand, and cocaine importation and distribution on the other. As a result, he claims the only possible relevance of that evidence was to impermissibly demonstrate his bad character and propensity to break the law. Iglesias next contends that the government failed to establish that he formed the requisite intent to kidnap anyone. He argues that, despite the fact that he pled guilty to the kidnaping charge, the evidence presented showed only that he was involved in the ransom portion of the kidnaping, not the actual abduction. Finally, Iglesias argues that the probative value of the evidence was substantially outweighed by the unfair prejudice that resulted from its admission because the government possessed sufficient evidence of his intent without it. As a result, Iglesias contends that the evidence of his prior convictions should have been excluded or, at the very least, the district judge should have redacted the kidnaping portion of the prior conviction, leaving only the marijuana trafficking portions.

Because the district court admitted the prior convictions over appellant's Rule 404 objections, we begin our discussion with that rule.[4] Subject to specific exceptions, Rule 404(b) provides that extrinsic evidence is not admissible to prove defendant's character in order to show action in conformity therewith. Such evidence is, however, admissible if it is relevant to other material issues in the case. Specifically, the test for admissibility of extrinsic evidence under Rule 404(b) that we apply has three parts:

> First, the evidence must be relevant to an issue other than the defendant's character. Second, as part of the relevance analysis, the evidence must be sufficient to support a finding that the defendant actually committed the extrinsic act. Third, the probative value of the evidence must not be substantially outweighed by unfair prejudice.

---

[4]Federal Rule of Evidence 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. F.R.E. 404(b).

14

*United States v. Diaz-Lizaraza,* 981 F.2d 1216, 1224 (11th Cir.1993); *See also, United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). In reviewing the district court's admission of Rule 404(b) evidence, we are governed by the abuse of discretion standard. *United States v. Miller,* 959 F.2d 1535, 1538 (11th Cir.) (en banc), *cert. denied,* 506 U.S. 942, 113 S.Ct. 382, 121 L.Ed.2d 292 (1992). Thus, we will not disturb the discretionary ruling of the trial court absent a clear demonstration by Iglesias that the district judge abused that discretion. After careful consideration, we do not believe that he has so demonstrated.

The circumstances surrounding appellant's 1982 convictions are a bit out of the ordinary. Those convictions involved the kidnaping of Linda Martinez, the wife of marijuana smuggler Jesus Martinez. It seems that Jesus had, in one way or another, lost a rather large load of marijuana which had been entrusted to him. The true owners were understandably distressed by this turn of events. Their solution: Kidnap Linda Martinez and hold her for ransom. The ransom: 3,000 pounds of marijuana. Unfortunately for them, however, Jesus turned to the police for help. They, with the cooperation of the Drug Enforcement Administration, set up a controlled delivery of the 3,000 pounds of marijuana. It was Iglesias who showed up to drive the marijuana-laden van away from the surveilled location. He was arrested and subsequently pled guilty to both marijuana trafficking as well as kidnaping. The jury was informed of these inter-related events through the testimony of an investigating police officer and by the introduction of a certified copy of the judgment of conviction and commitment order in that case.

Applying the first prong of the test, we believe that it is beyond question that Iglesias' prior convictions were directly relevant to a material issue in this case other than his character. The government proffered the evidence on the issue of intent and Iglesias concedes that, as a result of his theory of defense, his intent was a material issue. Evidence of prior large scale drug trafficking is directly relevant to the question of intent regarding the charged crimes of cocaine importation and distribution. *See Diaz-Lizaraza,* 981 F.2d at 1224. Iglesias' relevancy arguments, however, are

focused on the admission of evidence relating to the kidnaping portion of his prior conviction. Specifically, Iglesias contends that before the certified copy of the judgment of conviction and commitment order from that case was introduced, the kidnaping portion should have been redacted and the testifying witness admonished not to discuss it. The district judge refused this request, stating that the entire circumstances of the prior drug trafficking incident should be presented to the jury.

While we cannot say that we would have made the same ruling had we been in the position of the district judge, we also cannot say that his decision abused the broad discretion with which trial judges are vested in ruling on evidentiary matters. Iglesias' arguments would be well taken had the conviction in question been for an ordinary run-of-the-mill kidnaping, if indeed there is such a thing. This kidnaping, however, was undeniably intertwined with his highly relevant prior drug trafficking and, it would appear from the record, perhaps inextricably so. The only realistic way for the government to explain to the jury how it was that appellant came to be in possession of a van loaded with 3,000 pounds of marijuana, that is that he was not just merely present in that situation as well, was to divulge some details of the kidnaping. The record indicates that the government did not linger on the kidnaping more than was necessary to place Iglesias at the scene of the controlled delivery and explain his subsequent arrest with the marijuana. *See* R. 12-196-204. In short, it was well within the district judge's discretion to find the entire drug-related episode relevant.

Under the second prong of the test, the evidence of Iglesias' prior conviction must be sufficient to support a finding that he actually committed the act in question. In this case, his convictions were based upon his guilty plea to both the kidnaping and marijuana trafficking charges. Again, the jury heard the testimony of the investigating officer who witnessed Iglesias enter the van and his subsequent arrest, as well as received a copy of his judgment of conviction. Appellant's contention that his guilty plea does not provide a basis upon which a jury could reasonably conclude that he formed the requisite intent is misplaced and merits little discussion. First, the fact that he was convicted of the extrinsic crimes sufficiently answers the question of whether he had the intent

16

to commit them. If Iglesias did not have the intent to kidnap anyone, he should not have pled guilty to kidnaping. Second, and more importantly, the proper inquiry is whether the government's evidence supports a finding that Iglesias actually committed the extrinsic act, not whether he had the requisite intent. *See Diaz-Lizaraza,* 981 F.2d at 1224. It is elementary that a conviction is sufficient proof that he committed the prior act. *United States v. Arambula-Ruiz,* 987 F.2d 599, 603 (9th Cir.1993). The fact that the conviction was based on a guilty plea is inconsequential. *See United States v. Edwards,* 696 F.2d 1277, 1280 (11th Cir.), *cert. denied,* 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983) (holding that appellant's own statement admitting act, even if mere puffery, is sufficient to justify a jury finding that he committed the act for purposes of Rule 404(b)).

Under the third and final prong of our inquiry, the probative value of the evidence must not be *substantially outweighed* by unfair prejudice. Again, this determination lies within the sound discretion of the district judge and calls for a "common sense assessment of all the circumstances surrounding the extrinsic offense," including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness. *Beechum,* 582 F.2d at 914-15; *See also Diaz-Lizaraza,* 981 F.2d at 1225.

We have already determined that the extrinsic crimes involving possession of 3,000 pounds of marijuana (inarguably a dealer amount) and the present cocaine importation and distribution charges, bore sufficient similarity to uphold the district judge's relevance determination. We are also of the opinion that the six year span between Iglesias' prior convictions and the conduct upon which the present charges are based does not render the 1982 conviction too remote for proper consideration. Finally, we must ask whether the government was in need of this evidence to demonstrate Iglesias' intent. *Id.* As we have explained, "if the government can do without such evidence, fairness dictates that it should; but if the evidence is essential to obtain a conviction, it may come in. This may seem like a "heads I win; tails you lose' proposition, but it is presently the law." *United States v. Pollock,* 926 F.2d 1044, 1048 (11th Cir.), *cert. denied,* 502 U.S. 985, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991).

Iglesias contends that the government did not need to introduce the evidence because it possessed sufficient evidence of his guilt, including his intent, through the testimony of previously convicted coconspirators Alvarez, Garcia, and Torress. We disagree for two reasons. First, we have long recognized the " "special difficulty of proving intent in conspiracy cases.'" *Diaz-Lizaraza,* 981 F.2d at 1225 (quoting *Pollock,* 926 F.2d at 1048). Ample precedent exists in this circuit finding that a not guilty plea in a drug conspiracy case, such as we have here, makes intent a material issue and opens the door to admission of prior drug-related offenses as highly probative, and not overly prejudicial, evidence of a defendant's intent. *Id.* (citations omitted). Second, while we agree that the government's case against Iglesias was substantial, it did rest on the testimony of coconspirator witnesses. Given the fact these were not "overwhelmingly credible witnesses," we cannot say that the government had no need to introduce evidence of appellant's prior drug activity to establish his intent. *See Diaz-Lizaraza,* 981 F.2d at 1225; *see also United States v. Cardenas,* 895 F.2d 1338, 1344 (11th Cir.1990). These witnesses were obviously subject to impeachment on several fronts. Indeed, as we have discussed above, Iglesias' fellow appellants spend considerable time arguing that these witnesses were inherently incredible. As a result, we do not believe that the district judge abused his discretion in implicitly determining that the probative value of appellant's drug-related convictions was not substantially outweighed by unfair prejudice.[5]

Furthermore, any unfair prejudice that may have existed was mitigated by the district judge's limiting instruction. *Diaz-Lizaraza,* 981 F.2d at 1225. Immediately following the introduction of the evidence of Iglesias' prior convictions, and again during his final charge, the district judge instructed the jury that it could "consider the evidence not to prove Manuel Iglesias did the acts charged in this case, but only to prove that the defendant's state of mind, that is, that the defendant, Iglesias, acted with the necessary intent, and not through accident or mistake." Accordingly, we conclude that the district judge did not abuse his discretion in admitting the 404(b) evidence.

---

[5]After hearing argument that this evidence was "highly prejudicial" the district judge found that "it appears that this is proper 404(b) evidence." R. 12-191-194. Thus, we presume that he properly weighed the probative value against the prejudicial effect.

V. Prosecutorial Misconduct

Iglesias next contends that the government, through the actions of the Assistant United States Attorney ("AUSA") assigned to prosecute this case, committed various acts of misconduct that warrant reversal of his conviction. We do not agree. In addressing a claim of cumulative error, we must examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial. *United States v. Blasco,* 702 F.2d 1315, 1329 (11th Cir.), *cert. denied sub nom. Galvan v. United States,* 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983). We first consider each claim individually to assess whether Iglesias' assertions of error are correct.

A. Witness Examination

Iglesias first asserts that the AUSA improperly elicited testimony from Customs Agent David Robinson during his re-direct examination regarding appellant's prior conviction for kidnaping. Agent Robinson had been asked on cross-examination by Iglesias' counsel about the dismissal of a prior indictment against appellant based upon the same events as the current indictment. From the record, it appears that defense counsel's questions were designed to insinuate that the reason the indictment was dismissed was that the government determined that insufficient evidence existed to convict Iglesias. *See* R. 8-436-438. On re-direct, the AUSA asked the agent why the indictment had been dismissed. Iglesias' objected on the grounds that the question called for a legal conclusion. The district judge, however, found that defense counsel's line of questioning had opened the door to the AUSA's question. Agent Robinson answered:

> We found out from the FBI, from the finger print cards that were sent in, that those finger prints that were taken from the gentleman who is now known as Manuel Iglesias having given us the name of Alvaro Perez at the time of arrest, those finger prints for instance the FBI showed that he had been previously arrested for kidnaping.

R. 8-445-446. This drew another general objection from Iglesias. The district judge sustained the objection, instructed the jury to disregard the answer, and denied Iglesias' motion for a mistrial. Iglesias asserts that, despite the curative instruction, this comment amounted to "plain error." "'Plain error' is found where there is a particularly egregious error that seriously affects the fairness,

19

integrity or public reputation of the judicial proceedings." *See United States v. Elkins,* 885 F.2d 775, 784 (11th Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990).

We have already determined that, at a later point in the trial, the district judge committed no error in admitting evidence of Iglesias' drug-related kidnaping as Rule 404(b) evidence. Thus, the jury would be in possession of the information that Iglesias was an admitted kidnapper soon after Agent Robinson's testimony. We conclude that its injection into the trial at this point, although improper, does not appear to rise to the level of misconduct and was not so egregiously prejudicial that it could not be cured by the appropriate instruction.

First, we must agree with the district court that appellant's line of questions regarding the dismissal of the original indictment against him certainly entitled the government to rebut appellant's subtle insinuations by asking the witness to explain the reason for the prior dismissal. As for the gratuitous information offered by the witness regarding appellant's prior criminal activity, while it may have been unresponsive to the question, it falls far short of being so prejudicial that the fundamental fairness of the proceedings would be called into question. *Compare United States v. DeGeratto,* 876 F.2d 576, 586-87 (7th Cir.1989) (holding *repeated* questioning and closing argument comments on a variety of uncharged misconduct, including "loan sharking," was clearly prejudicial and "too far afield," thus warranting a new trial). As we have repeatedly stated, "a prejudicial remark may be rendered harmless by curative instructions to the jury." *See e.g., United States v. Simon,* 964 F.2d 1082, 1087 (11th Cir.1992), *cert. denied,* 507 U.S. 1033, 113 S.Ct. 1854, 123 L.Ed.2d 476 (1993) (internal citations and quotation marks omitted) (upholding denial of mistrial where prosecutor made improper comments suggesting a shift in the burden of proof). Such an instruction "purges the taint of prejudicial remarks because a "jury is presumed to follow jury instructions.' " *Id.* (quoting *Adams v. Wainwright,* 709 F.2d 1443, 1447 (11th Cir.1983), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984)).

In this case, the district judge sustained defense counsel's objection and promptly instructed the jury to disregard the answer. Furthermore, as we noted above, the jury was also instructed twice

regarding the proper use of the testimony that Iglesias had been convicted in a drug-related kidnaping, which is precisely the testimony that Agent Robinson gave. Appellant offers nothing to rebut the presumption that the jury followed these instructions.

Iglesias also objects to the testimony of Drug Enforcement Administration ("DEA") Agent George Miller who testified that when Iglesias was arrested in December 1989, he identified himself as "Del Campo." Iglesias asserts that there was no legitimate purpose to support eliciting this testimony because it involved "an unrelated extrinsic crime occurring in 1989." Appellant's Brief at 19. His argument runs directly contrary to the record. According to Agent Miller's testimony, Iglesias was arrested by the Miami Police after he fled from the area Agent Miller was surveilling. It was to Agent Miller that appellant represented himself has "Del Campo" while being processed at the DEA office in Miami on the charges contained in the November 15, 1989, indictment against him. We find nothing improper about this testimony.

In any event, Iglesias failed to object to Agent Miller's testimony at trial. As an evidentiary matter, a contemporaneous objection was required to allow the district court the opportunity to correct any error that may have existed. *Simon,* 964 F.2d at 1085. Absent such an objection, we do not apply the customary abuse of discretion standard. Our review, rather, would be limited to a search for "plain error." While the relevance of this testimony may not be readily apparent, it was clearly not plain error to allow its admission.

B. *Disclosure of Jencks Material*

Iglesias next alleges that the government misrepresented the existence of Jencks material.[6] Following the direct examination testimony of Harold Garcia, counsel for Pablo Martinez demanded that the government provide the defendants with a transcript of some prior testimony of Garcia which was given at a suppression hearing before a magistrate judge during the prosecution of a related case. A lengthy hearing followed in which counsel argued that the government's obligations under the Jencks Act and Rule 26.2 of the Federal Rules of Criminal Procedure required it to provide that testimony.[7] Counsel further argued that, even if the government did not have actual possession of the transcript, it knew of its existence and was required to order it and give it to defendant so that "I don't have to spend my client's money to acquire these things." R. 10-147. The government responded that it never ordered a transcript of the hearing and, therefore, there was nothing to provide because the information was not "in the possession of the United States" within the meaning of 18 U.S.C. § 3500 or Rule 26.2. The government further pointed out, and counsel apparently conceded, that at least one of the defense attorneys knew of the testimony's existence because he was present during the suppression hearing in which it was given. The district judge denied both the motion to obtain the transcript, as well as a second motion by Iglesias' attorney to dismiss on the basis of prosecutorial misconduct. The district judge's staff did, however, locate an audio tape of the suppression hearing proceedings which the district judge then made available to defense counsel. R. 10-203-204.

---

[6]This refers to the government's obligations under 18 U.S.C. § 3500 which, in relevant part, provides:

> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

[7]Again, the district judge explicitly treated the motion as having been made by all defendants in the case.

We need spend little time addressing Iglesias' contentions in this regard. Our precedent on this issue could not be more clear. The government is not required to disclose any statement in its possession until after the witness has testified on direct. *United States v. Loyd,* 743 F.2d 1555, 1565 (11th Cir.1984). Thus, such disclosure would not be untimely or tardy. Further, "[a] statement is "in the possession of the United States' for Jencks Act purposes if it is in the possession of a federal prosecutorial agency." *United States v. Cagnina,* 697 F.2d 915, 922 (11th Cir.) *cert. denied,* 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983). In *Cagnina* the defendant sought from the government the prior testimony of a government witness given during a suppression hearing. In upholding the district judge's denial of the Jencks request, we stated:

> The testimony of [the witness] had apparently never been transcribed. In any event, no transcript was in the prosecutor's possession. Anything in control of a district court, such as the court reporter's notes, is not in the possession of the prosecutor and therefore does not fall within the requirements of the Jencks Act. Because neither [witnesses'] testimony was in the possession of the prosecutor and both could have been obtained by the defendant with reasonable diligence, the Government had no obligation to produce them.

697 F.2d at 922-23 (citations omitted). Closer factual similarity could not exist. The district judge here found, and counsel conceded, that there was nothing to indicate that the government did in fact have possession of a transcript of the hearing testimony. Accordingly, there was nothing to disclose or provide under either the Jencks Act or Rule 26.2. The defendants' argument at trial that the Jencks Act was intended to force the government to search for such readily available statements, order them, and turn them over to the defense so that the defendant will not have to spend his own money is utterly without merit. We find no prosecutorial misconduct here.

In any event, Iglesias has not alleged, nor do we find, any prejudice. From the record, it appears that the district judge went to great lengths to afford defense counsel the opportunity to listen to the suppression hearing tape and obtain a transcript if they so desired. Under these circumstances, we fail to see how there could be any prejudice.

C. Closing Argument

Iglesias next claims that the prosecutor's rebuttal argument was so improper and inflammatory that his due process rights were violated. As a result, he argues, his conviction must

be reversed and a new trial held. "For a prosecutor's remarks to offend due process, the remarks must be improper and a reasonable probability must exist that, but for the offending remarks, the defendant would not have been convicted." *United States v. Rodgers,* 981 F.2d 497, 499 (11th Cir.1993). "Prosecutorial misconduct is a basis for reversing an appellant's conviction only if, in the context of the entire trial in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused." *United States v. Lopez,* 898 F.2d 1505, 1511 (11th Cir.1990) (citing *United States v. Reed,* 887 F.2d 1398, 1402 (11th Cir.1989), *cert. denied,* 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990)). We apply these standards in reviewing the three specific areas of impropriety which appellant asserts.

First, Iglesias takes exception to the prosecutor's beginning remarks of his rebuttal argument which were allowed by the district judge over the defendants' objections. The prosecutor stated:

> It offends me that lawyers can come up here and argue their case and call witness [sic] and yet these lawyers misstate the evidence to you.
>
> It offends me that lawyers can come up to you and tell us that witness [sic] are lying and then they incorrectly recite facts that weren't in evidence for you.
>
> It offends me that lawyers can come up here and impugn the integrity of agents after calling these witness [sic] liars with no basis in fact whatsoever.
>
> It offends me that lawyers can come up here and call witnesses liars and not have listened during the trial that has lasted three weeks to understand the sequence in which the case was presented to you.
>
> I submit to you one day there is going to be a great book of fiction entitled lawyers [sic] closing arguments.

Supp.R. 1-3-3-4. Iglesias argues that these statements amounted to the injection of personal beliefs and vouching for the credibility of the government's witnesses. The government contends that, taken in context, these statements were merely introductory comments meant to outline the prosecutor's rebuttal that was to focus on specific assertions of defense counsel and characterizations of witnesses with which the government disagreed. Immediately following them, he stated:

> I just want to go down the list as to each attorney and help correct those misstatements that were made to you and help correct the inaccuracies because you are here to determine the facts that are in evidence, not what lawyers tell you because that is not evidence.

24

Supp.R. 1-3-4. We agree with the government that the prosecutor's statements were, at a minimum, unartful. We do not, however, find that they rise to the level of misconduct. In hindsight, we agree that different words should have been chosen, but we are not prepared to say Iglesias has demonstrated that they were part of a calculated attempt to inflame the jury. Assuming for the moment that they were, it would strain reason to say that, taken in context of this entire three week trial, these five short statements were so infectious and prejudicial that, but for them, Iglesias would not have been convicted. Thus, we find no misconduct and, hence, no due process violation.

Iglesias' second claim of misconduct arising from the prosecutor's closing argument concerns his allegation that the prosecutor deliberately misrepresented facts in the record to the jury. Specifically, Iglesias contends that the prosecutor argued facts not in evidence when addressing Iglesias' defense that he was merely unwittingly present at the scene of the drug trafficking in order to give his brother a ride home. The evidence showed that it was during this time that weapons were delivered to the conspirators from the same car in which Iglesias soon left. The prosecutor argued that Iglesias was present because he was involved in supplying the conspirators with weapons. Iglesias' objection that this was a misstatement of the evidence was initially sustained, but after explaining that he was arguing an inference that could be drawn, the district judge allowed the prosecutor to continue. Supp.R. 1-3-34-35.

"Although it may be error to allow counsel to argue to the jury facts that are not in evidence, "a attorney is entitled to urge the conclusions which the attorney thinks the jury should draw from the evidence.'" *United States v. Braithwaite,* 709 F.2d 1450, 1456 (11th Cir.1983) (quoting *United States v. Allen,* 588 F.2d 1100, 1108 (5th Cir.), *cert. denied sub nom., Perkins v. United States,* 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979)). In this case, we think it clear that there was evidence to support the inference urged by the prosecutor in this part of his closing argument. The jury was instructed that the arguments of the lawyers where just that—arguments, not evidence. We therefore find no misconduct.

25

Furthermore, as Iglesias himself aptly points out in his brief, there was other substantial evidence of his participation in this conspiracy. The jury heard evidence that Iglesias obtained the services of Caderno to captain the *What's Up* for the third trip, was paid $50,000 for his integral efforts, helped unload a shipment of burlap bags in which the cocaine was to be stored, and told Torres that the weapons discussed above had been brought to the location to protect the cocaine shipment. Appellant's brief at 14. Thus, again, even assuming the argument was improper, we are not prepared to say that, but for the prosecutor's comments, the outcome would have been different.

The third and final assertion that Iglesias makes concerning the government's rebuttal is that the prosecutor's reference to Iglesias' prior conviction for the drug-related kidnaping was the culmination of the prosecutor's efforts to portray appellant as a "bad man with the propensity to break the law" and amounted to "a flagrant violation of the appellant's substantial right to his presumption of innocence for the crime charged as guaranteed by the due process clause [sic]...." The reference occurred during the prosecutor's attempt to rebut Iglesias' argument that the government dismissed the original indictment against Iglesias for lack of evidence. Defense counsel objected on the grounds that "[t]here is a purpose for that testimony and the Court is going to instruct what that purpose is." In sustaining the objection, the district judge stated, "That's correct; it is to determine intent which is an issue in this case. Sustained."

As we have twice stated, this evidence was relevant to the issue of Iglesias' intent. While the district judge had stricken Agent Robinson's testimony regarding the kidnaping, that information came in later as Rule 404(b) evidence. It is clear that the prosecutor should not have used the evidence in the manner he was attempting to here. As we have also twice stated, however, the district judge repeatedly instructed the jury that it was only to consider that evidence on the issue of appellant's intent. Indeed, in sustaining the objection, the judge again stated for the jury the sole purpose for which the evidence was to be used. Because the jury is presumed to follow the court's instruction and, more importantly, because we do not find that this improper comment was so

prejudicial that it deprived Iglesias of a fair trial or dictated the outcome, we must reject his argument.

Thus, from our review of the prosecutor's actions, taken individually or as a whole, we find no misconduct on the part of the government that deprived Iglesias of his due process right to a fundamentally fair trial.

VI. Improper Prosecutorial Comment

Noa, Abella, and Iglesias contend that they are entitled to a new trial because the prosecutor allegedly made an improper reference to the appellants' exercise of their right not to testify. Specifically, appellants challenge comments made by the prosecutor during the testimony of Harold Garcia, a government witness. On cross examination, Noa's counsel attempted to discredit Harold Garcia's testimony. Counsel referred to GX36, a photograph of the off-load site for the first shipment and the following exchange occurred (R. 10-244):

Q. How do we now [sic] that the *What's Up* was there?

A. How?

Q. How.

A. Because I am saying the truth that it was there.

Q. And if you didn't tell us it was there, we would never know it.

A. That's correct.

Q. And there would be no way to collect on it. [An apparent reference to the Rule 35 motion the government would file on Garcia's behalf in return for Garcia's testimony.]

A. I don't know.

Q. It is your word?

A. My truth.

Q. And you are telling the truth?

A. Yes, sir.

27

Noa's counsel then referred to GX36, a photograph of the Rusty Pelican Marina where the *What's Up* was docked, after its return with the first load, and the following occurred (R. 10-244-245):

Q. And here is the Rusty Pelican Marina?

A. Yes sir.

Q. The *What's Up* isn't there now, is it?

A. Not now.

Q. But it was at one time?

A. yes.

Q. Because you told the government?

A. I did.

Q. And I were [sic] telling the truth so it must have been there.

A. Correct, sir.

On redirect, government counsel inquired about GX78, a photograph of a house in the Bahamas where Garcia stayed with Abella, Noa and another co-defendant, prior to delivery of the third load. Referring to events related to that house, the following occurred (R. 11-111):

Q. Now you were asked earlier and you were shown these various photographs, government 78. Tell us again what this is?

A. This is the white house where Jose Abella and Oro and I stayed there.

Q. This doesn't show you all there in that pretty photograph, does it?

A. No.

Q. But you were asked are you the only person that can tell us about that incident? Are you?

A. Yes, sir. I have been asked that.

Q. But is that a true statement? Are you the only person that can tell us about that?

A. No.

Q. Who else?

A. Jose Abella, Oro [Noa], Yvonette Estrada and I Harold Garcia.

28

Noa's counsel objected and moved for a mistrial. The court sustained the objection and instructed the jury to disregard the witness's answer. The court interpreted the question as one inquiring whether the government agents who accompanied Garcia to the site could testify about the scene depicted in the photographs. The court stated that "[i]t is a silly question to ask him. Let me tell the jury obviously the government agent can tell them who was in the pictures." R. 11-112. The prosecutor continued to question Garcia about the events that had occurred at the locations depicted in the photographs. Noa's counsel objected again on the grounds that the question stemmed from the same line of questioning which led to the previous objection. The district court noted that "it is unfair to leave in the minds of the jury the implication that their sole source of information about this is this particular witness. That is unfair and he has the right to correct that unfairness." R. 11-116. However, because defense counsel had no intention of arguing that Garcia was the only one present at the places depicted in the photographs, the court sustained the objection and instructed the jury to disregard the series of questions dealing with photographs.

The standard for determining whether a prosecutor has made an impermissible comment on appellants' right not to testify is whether or not the statement was manifestly intended or was of such character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. *United States v. Watson,* 866 F.2d 381, 386 (11th Cir.1989). A reviewing court will review the trial judge's determination of whether manifest intent was present under the abuse of discretion standard. *Id.* Moreover, the remark must be examined in the context in which it was made. *United States v. LeQuire,* 943 F.2d 1554, 1565 (11th Cir.1991), *cert. denied,* 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992). Because only the trial judge had the opportunity to view the prosecutor's demeanor first hand, we review only for abuse of discretion the trial judge's determination of whether manifest intent was present. *Watson,* 866 F.2d at 386.

After reviewing the context in which the challenged statements were made, we find that the prosecutor's questions were not manifestly intended as a comment on the appellants' exercise of their right not to testify. The government contends that the prosecutor was merely asking who else was

involved in the events depicted in the photographs to rebut defense counsel's suggestion that Garcia was not credible. This court has observed that there is no infirmity when the comment is offered to rebut a defense attack on a prosecution witness's credibility. *LeQuire,* 943 F.2d at 1565. The district court viewed the questioning as an attempt to rebut the implication that Garcia was the government's only source of information regarding the events that took place at the places depicted in the photographs. No manifest intent exists where there is another, equally plausible explanation for the remark. *Id.* We find both the government's "invited argument" explanation and the district court's interpretation of the prosecutor's intent as plausible as the appellants' claim that the questioning was manifestly intended as a comment on the appellants' decision not to testify. Therefore, we conclude that the district judge did not abuse his discretion in finding no manifest intent.

With regard to the second part of the test—whether the comments were of such character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify—"the question is not whether the "jury possibly or even probably would view the challenged remark in this manner but whether the jury *necessarily* would have done so.' " *LeQuire,* 943 F.2d at 1567 (quoting *United States v. Griggs,* 735 F.2d 1318, 1324 (11th Cir.1984)) (emphasis in original). The comments were not a direct comment on appellants' exercise of their right not to testify as was the case in *LeQuire,* 943 F.2d at 1564 ("he doesn't have the guts to tell it about the Colombians and get on that stand"). Rather, the questions at issue merely elicited a response that the appellants could provide information about the locations depicted in the photographs. We do not view the prosecutor's questions as sufficiently egregious to find that the jury would necessarily conclude that the questions were comments on the appellants' exercise of their right not to testify.

VII. Sentencing

Various appellants challenge the district judge's application of the United States Sentencing Guidelines.[8] We address each seriatim.

---

[8] In our review, we apply the sentencing guidelines in effect at the time of appellants' sentencing hearings. *United States v. Shields,* 87 F.3d 1194, 1196 (11th Cir.1996).

A. U.S.S.G. § 3B1.3

Garcia, Calderon, and Caderno each challenge the two-level enhancement they received as a result of the district judge's application of U.S.S.G. § 3B1.3 to them based upon their respective services as captain of the *What's Up* during the three cocaine smuggling missions. Section 3B1.3 provides, in relevant part:

> If the defendant abused a position of public or private trust, or *used a special skill,* in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.

(Nov. 1990) (emphasis added). " "Special skills' refers to a skill not possessed by members of the general public and usually requiring substantial education, training *or licensing.* Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." *United States v. Malgoza,* 2 F.3d 1107, 1110 (11th Cir.1993) (quoting U.S.S.G. § 3B1.3, comment (n. 2) (Nov. 1990)) (internal quotation marks omitted) (emphasis added). In reviewing challenges to the application of U.S.S.G. § 3B1.3, "we review the legal meaning of the term "special skills' *de novo.*" *Id.* In contrast, however, we review for clear error the district judge's application of the guidelines to the facts of the case. *Id.*

First, after reviewing our precedent, as well as that of other circuits, we are convinced that captaining a vessel on the high seas is the type of activity that requires skills not possessed by members of the general public and, therefore, requires "special skills" within the meaning of section 3B1.3. *See e.g., Malgoza,* 2 F.3d at 1110 (holding that advanced radio operating ability such as knowledge of radio frequencies, ability to set up the necessary equipment and ability to operate the radio required "special skills" within the meaning of section 3B1.3). Appellants argue that one can learn to pilot a thirty-eight foot boat and obtain a license after a few weeks training by the United States Coast Guard and therefore that activity does not require "special skills." We find that argument unpersuasive. The focus of the inquiry is on the skills members of the public possess generally, not what they could do after weeks of training. In *Malgoza* for example, we think it obvious that many people own radios and most people could learn to skillfully operate them at an

advanced level after weeks of training. The average person off the street without such training, however, could not. In that case, we properly focused on the skills that members of the public would presently possess, not what they could learn.

Likewise, we do not believe that an average person off the street would possess the requisite skills to captain a cocaine laden boat on the high seas from the Bahamas to a predetermined specific location in Southern Florida using a chart and compass at night without lights while taking care to elude detection by the throng of law enforcement agencies tasked with preventing the importation of cocaine. Our conclusion is buttressed by the fact the appellants were each payed $150,000 per trip, exponentially more than captains of similar boats receive for pleasure outings. While this tidy sum was no doubt inflated to reflect the profits involved with drug dealing and to offset the risk and consequences of getting caught attempting to smuggle cocaine into the United States, that still does not explain why appellants were paid far more for their role as captains than were other members of the crew. Similarly, why did captains have to be "recruited" for each load? If anyone could provide such services, why didn't existing participants in the conspiracy take on that role, thereby reducing the cost of the operation as well as the chances of detection? The obvious answer, we believe, is that captaining the boat required skills not possessed by the other participants.

We also find the testimony of defense witness Ben McMechem incredible, as did the district judge. Mr. McMechem testified that based on his thirty years of experience he did not believe that special skill was required to safely pilot a boat from the Bahamas to Florida. He testified that one could do so by sailing toward the setting sun or by merely following beer cans. Supp.R. 1-12-10. Assuming for the sake of argument that one might be able to come ashore somewhere in Florida by following either these ill-advised methods, the evidence shows that appellants were interested in accomplishing a much more refined landing at a predetermined location. We very much doubt that this trail of beer cans would lead to the prearranged site for the off loading of the illicit cargo or, even if it did, that appellants would be able to follow it at night without lights. To suggest that the coconspirator would entrust a boat loaded with millions of dollars worth of cocaine to captains who

32

had no more skill in navigating a boat in the Atlantic Ocean than someone directly off the street, especially given all the anti-detection measures required on a voyage such as this, is, as the district judge aptly put it, "ludicrous" and "off-the-wall bizarre." Supp.R. 1-12-30.

The remaining inquiry, then, is whether the district judge's factual conclusion that appellants used these skills in a manner that facilitated the commission of the offenses was clearly erroneous. Based on the evidence presented during the trial and the resultant jury verdicts, it obviously was not. Accordingly, we affirm the district judge's imposition of a two level enhancement pursuant to U.S.S.G. § 3B1.3 based upon appellants' respective roles as captain of the *What's Up.*

B. Appellant Gamboa

Gamboa raises four assertions of error relating to his 200 month sentence for his participation in this conspiracy.

1. *Relevant Conduct under U.S.S.G. § 1B1.3(a)(1)*

Gamboa first contends that he was erroneously held responsible for all 503 kilograms of cocaine brought in on the second voyage of the *What's Up* rather than only the seventy kilograms which the evidence showed he allowed to be stored at his residence after its off loading. This, he claims, represented his only contact with the cocaine as he was not shown to be present on the voyages or at the off loadings. While he now admits that his van was used to transport the cocaine, he denies that he knew that it was being used for that purpose at the time. The government argues that the district court properly rejected Gamboa's argument in this regard and found that, although Gamboa had personal contact with only seventy kilograms, he had committed acts in furtherance of the conspiracy and, therefore, was liable for the full amount. We review the district court's determination as to the quantity of drugs attributable to a defendant under the clearly erroneous standard. *United States v. Beasley,* 2 F.3d 1551, 1561 (11th Cir.1993). We find that the district judge's quantity determination was not clearly erroneous.

For sentencing purposes, a member of a drug conspiracy is liable for "all acts and omissions committed or aided and abetted by [him], or for which [he] would be otherwise accountable, that

33

occurred during the commission of the offense of conviction...." U.S.S.G. § 1B1.3(a)(1)(B) (Nov. 1990). Application Note 1 to that section states:

> In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant.

Also instructive to this case is Illustration (a) to that note. It provides the following example:

> Defendant A, one of ten off-loaders hired by Defendant B, was convicted of importation of marihuana, as a result of his assistance in off-loading a boat containing a one-ton shipment of marihuana. *Regardless of the number of bales of marihuana that he actually unloaded, and notwithstanding any claim on his part that he was neither aware of, nor could reasonably foresee, that the boat contained this quantity of marihuana. Defendant A is held accountable for the entire one-ton quantity of marihuana* on the boat because he aided and abetted the unloading and hence the importation, of the entire shipment.

(emphasis added).

Gamboa was convicted of possession with intent to distribute and conspiracy to possess with intent to distribute cocaine. The evidence showed that his van was used to transport most of the 503 kilograms of cocaine that arrived on the second voyage of the *What's Up* away from the off-loading site. Most of this 503 kilograms of cocaine was stored at Blas Duran's house, but seventy kilograms would not fit. Those seventy kilograms were taken to Gamboa's house where Gamboa was at home and where he helped carry it to his bedroom for counting. The evidence further showed that Duran showed up a short time later with his log book to take an official count of the cocaine and add that number to that which was stored at Duran's house. Gamboa assisted with this counting. Gamboa then helped load the cocaine into the trunk of a car for storage and allowed that car to remain in his driveway for several days. Finally, Gamboa allowed the owner of the car in which the cocaine was stored to continue to use Gamboa's van during the time the cocaine remained in the car.

After carefully considering this evidence, we cannot say that the district judge's determination that Gamboa was accountable for the entire 503 kilograms of cocaine was clearly erroneous. It is clear that Gamboa joined this conspiracy while it was already in progress. That, however, does not change the fact that by doing so he became responsible for all conduct associated with that shipment of cocaine that was reasonably foreseeable. The government showed by a

34

preponderance of the evidence that Gamboa knew or reasonably could have foreseen that much more cocaine was involved than the seventy kilograms stored at this house. As we have noted, Gamboa assisted Duran with the counting and knew that Duran was recording that number in his log in order to arrive at a grand total for the second shipment. As in the example noted above, the fact that Gamboa had personal contact with only seventy kilograms does nothing to change the fact that through his actions he aided and abetted in the conspiracy's efforts to possess and distribute the cocaine as well as conceal it. There was no clear error here.

2. *U.S.S.G. § 3B1.2(a)*

Gamboa next asserts that he was entitled to a four-level reduction in his offense level because he played only a minimal role in the conspiracy. The government counters that the district judge properly concluded that Gamboa's "role was a necessary one and it was not minimal." Supp.R. 1-6-7. Again, we review the district judge's factual determination for clear error. *United States v. Freyre-Lazaro,* 3 F.3d 1496, 1506 (11th Cir.1993), *cert. denied sub nom. Llerena-Acosta v. United States,* 511 U.S. 1011, 114 S.Ct. 1385, 128 L.Ed.2d 59 (1994). In doing so, we realize that "[t]he district court's decision to apply [or not apply] an adjustment "involves a determination that is heavily dependent upon the facts of the particular case.' " *Id.* (quoting U.S.S.G. § 3B1.2 (Nov. 1990)).

Section 3B1.2(a) provides that "[i]f the defendant was a minimal participant in any criminal activity, decrease by 4 levels." U.S.S.G. § 3B1.2(a) (Nov. 1990). The Application Notes to that section state that "[i]t is intended that the downward adjustment for a minimal participant will be used infrequently." *Id.* at Application Note 2; *See also United States v. Taxacher,* 902 F.2d 867, 873 n. 7 (11th Cir.1990), *cert. denied,* 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 242 (1991). The commission contemplated that this reduction will be applied only to a participant who is "substantially less culpable" than the other participants.

We have already recounted the evidence of Gamboa's conduct with regard to the second load of cocaine and, thus, there is no need to do so again. After careful consideration, we agree with the

35

district judge that Gamboa's role was not "minimal" as contemplated by section 3B1.2(a). Appellant's provision of the van for the transport of the cocaine and his willingness to allow his property to be used to store it, greatly contributed to the success, albeit short-term, of the conspiracy's plan to distribute large quantities of cocaine within the United States. While Gamboa's efforts may not have been enough to make him the linchpin of the operation, neither can his contribution be labeled as "minimal." Thus, we find no clear error in the district judge's refusal to reduce Gamboa's sentence pursuant to section 3B1.2(a).

3. *Downward Departure*

Gamboa next contends that the district judge should have departed downward from the sentencing guidelines based on various factors he characterizes as mitigating circumstances. Those factors include: 1) It was not shown that Gamboa received profit from the cocaine, nor any renumeration for his participation; 2) There was no evidence that he had prior knowledge of the cocaine's arrival or that his van was to be used to transport it; and 3) His nine years of service in the United States Army and ten year service with the Metro Dade Fire Department. Gamboa's Brief at 33. Regardless of whether or not we find these factors compelling, however, we have held, and appellant himself recognizes, that under the Sentencing Reform Act of 1984, downward departure is a matter of discretion that rests with the district judge and is ordinarily not appealable. As we have stated:

> To permit a defendant to appeal a sentence which falls below the guideline range would make meaningless the specificity of 18 U.S.C. § 3742, which permits a defendant to raise on appeal [only] the district court's upward departure from the guideline range. Nonetheless, review is available for a sentencing challenge based upon the district court's belief that it had no authority to depart from the sentencing guideline range. Thus this court had jurisdiction to review [appellant's] appeal only if the sentencing court denied downward departure based upon a misapprehension of its own discretionary authority to depart downward.

*United States v. Patterson,* 15 F.3d 169, 171 (11th Cir.1994) (internal quotation marks and citations omitted). Thus, we simply have no jurisdiction to review the district judge's discretionary decision unless it was made based upon the belief that he did not possess such discretion. *Id.*

36

Our review of the sentencing transcript does not lead us to believe that the district judge's decision was based on any such misapprehension of the scope of his authority. While it is true that his denial of the motion was somewhat cursory,[9] it in no way appears that he did not believe he could depart downward if he found that it was warranted. Thus, we find that Gamboa's claim in this regard is not cognizable.

4. *Denial of counsel's motion to withdraw*

Finally, Gamboa asserts that the district judge's refusal to allow Gamboa's attorney to withdraw from the case prior to sentencing warrants reversal of his sentence. Counsel made the motion following a series of *pro se* letters sent by appellant after his conviction to the district judge in which he asserted that counsel was derelict in filing proper motions, biased, inexperienced, and generally unenthusiastic about representing him. R. 3-283-284. At Gamboa's sentencing hearing, counsel argued that continuing with the representation would be unethical and run contrary to his clients wishes. Supp.R. 1-20-21. During argument on the motion, on which the government apparently took no position, counsel conceded that he did not take the allegations personally and that he could effectively argue any legal points on behalf of Gamboa that related to the sentencing. *Id.* Accordingly, the district judge denied the motion. Subsequently, counsel was allowed to withdraw and Gamboa's current counsel was appointed for purposes of appeal. Based upon what Gamboa claims were "traumatic and irreconcilable differences" between himself and trial counsel, he seeks reversal of his sentence.

Where, as here, a district court conducts an inquiry into the merits of a criminal defendant's motion for new counsel, we review the district judge's ruling for abuse of discretion. *United States v. Brown,* 79 F.3d 1499, 1505 (7th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 196, 136 L.Ed.2d 133 (1996); *United States v. Durman,* 30 F.3d 803, 812-13 (7th Cir.), *cert. denied,* 513 U.S. 1120, 115 S.Ct. 921, 130 L.Ed.2d 801 (1995); *United States v. Allen,* 789 F.2d 90, 92 (1st Cir.), *cert. denied,*

---

[9]The district judge simply stated that "[t]he motion to depart downward is denied." Supp.R. 1-6-27.

479 U.S. 846, 107 S.Ct. 164, 93 L.Ed.2d 103 (1986). In making this determination, several factors that should be considered by a reviewing court have been identified, the most relevant of which include: 1) the timeliness of the motion; 2) the adequacy of the court's inquiry into merits of the motion; and 3) whether the conflict was so great that it resulted in a total lack of communication between the defendant and his counsel thereby preventing an adequate defense. *Brown,* 79 F.3d at 1505. In addition, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

First, there is no argument that the motion was untimely. Second, the district judge heard the reasons for appellant's dissatisfaction with trial counsel before ruling on the motion. Supp.R. 1-19-22. Thus, our inquiry is limited to the third consideration listed above. *Durman,* 30 F.3d at 813. After careful consideration, we do not find that such a total breakdown in communications existed between Gamboa and his trial counsel.

The record indicates that trial counsel had been in contact with his client in order to prepare for the sentencing hearing. Nothing in Gamboa's *pro se* motions indicate that, although Gamboa was displeased with his trial counsel's performance, they were unable to communicate in manner that would allow for effective representation at the sentencing hearing. Our review of the case law convinces us that a much more serious breakdown in communications is required before a reviewing court should say that a district judge abused his discretion in refusing to allow counsel to withdraw. *See, e.g. Brown,* 79 F.3d at 1506 (counsel's accusation in open court that his client was a liar and subsequent argumentative relationship held insufficient to indicate breakdown in communication).

Moreover, even were we to find that the district judge abused his discretion, appellant must still demonstrate that, in the context of the sentencing hearing, he was somehow prejudiced by trial counsel continuing to represent him. *Durman,* 30 F.3d at 813; *United States v. Zillges,* 978 F.2d

38

369, 372-73 (7th Cir.1992). If he cannot show such prejudice, then the error was harmless. To successfully demonstrate prejudice, appellant must show that counsel's performance was "not within the range of competence demanded of attorneys in criminal cases" and that "but for" counsel's continued representation at the sentencing hearing, "the result of the proceeding would have been different." *Zillges,* 978 F.2d at 372-73 (quoting *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (internal quotation marks omitted). Our review of the record convinces us that Gamboa received adequate, albeit unsuccessful, representation at his sentencing hearing. Trial counsel vigorously argued Gamboa's position on a variety of issues at the hearing. Appellant makes no specific assertions of prejudice in his brief and we refuse to imply any from the simple fact that the outcome of sentencing hearing was not to his liking. There is nothing in the record or cited in Gamboa's brief that leads us to believe that the outcome of sentencing hearing would have been different had different counsel represented him. Thus, even if the district judge abused his discretion, no demonstrable prejudice resulted.

VIII. Appellant Martinez

Martinez contends that he is entitled to a Rule 35(b) motion to reduce his sentence in exchange for his cooperation in locating certain fugitives. Specifically, Martinez claims that the government promised him a reduction of his 336 month sentence in this case to sixty months. This sentence, according to appellant, would run concurrently with any sentence he received were he to be found guilty in an unrelated criminal case proceeding before District Judge Hoeveler. Martinez claims that that sentence was to be for no more than sixty months as well. The facts upon which he predicates his claims are quite involved and are detailed thoroughly in the briefs submitted by both appellant and the government. Thus, they will be summarized and repeated here only as necessary for understanding and resolution of Martinez's claim.

In July 1990, after his conviction in this case, but before he was sentenced, Martinez was indicted in another case which was assigned to Judge Hoeveler. Appellant apparently made it known that he was interested in cooperating with the government in hopes of reducing his sentence,

39

but was informed through his attorney that AUSA Kaiser, assigned to prosecute the present case, was not interested. Thereafter, on December 7, 1990, he was sentenced by Judge King in the present case to 336 months, that is twenty-eight years, imprisonment. While in a holding cell after his sentencing, Martinez told Hector Valdez, a confidential informant of Deputy United States Marshal Thomas Figmik, that he wanted to cooperate with the Marshal Service in its efforts to apprehend fugitives. He did this at Valdez's encouragement. Thus began a series of contacts between Figmik and Martinez that Martinez claims resulted in the promise of a sentence reduction described above in exchange for information that ultimately led to the capture of a dangerous fugitive.

Early on, Martinez's attorney found out about the meetings and demanded that they cease. He was assured by AUSA Mullaney, the prosecutor of the second criminal case proceeding before Judge Hoeveler, that they would. Appellant was transferred from Miami to a federal correctional institution for six months. He claims that during this time he was in contact with Valdez, but not Figmik or any other government agent. Martinez was returned to Miami where he claims he was contacted by Valdez who was seeking information about a specific fugitive for Figmik who "really wanted to capture" this particular fugitive. Martinez had such information and Valdez relayed this to Figmik. Figmik sought and received permission from Mullaney to meet with Martinez despite Mullaney's earlier assurances to appellant's attorney. Martinez told Figmik that before he provided the information, he wanted Figmik to make his cooperation known to both AUSAs Kaiser and Mullaney as well as Martinez's attorney. At this point, Martinez claims that Figmik told him that he would do so, but that his attorney was too hard to work with and suggested appellant retain attorney Lenny Baer, who was Hector Valdez's attorney. Figmik called Baer and had Baer contact appellant. No deals were apparently made at this meeting and Baer never became Martinez's attorney. On August 23, 1991, Martinez was again transported to Figmik's office. Figmik told Martinez that the meeting had been "authorized" by Mullaney, which Mullaney does not deny. It was at this point that appellant claims he made the specific sentence reduction demand in return for the information on the fugitive. According to Martinez, Figmik called Mullaney and then told

40

appellant that Mullaney had approved the deal. Figmik and Mullaney admit that they spoke by telephone, but vigorously deny that any deal was offered or authorized. Based on this claimed representation, Martinez says that he provided the information. Nothing relating to this alleged deal, however, was ever reduced to writin. It is clear that the information that Martinez provided led to the capture of the fugitive.

Again in October of 1991, Martinez's attorney found out about the meetings and contacted Mullaney to demand that they stop. Mullaney contacted Figmik's supervisor at the Marshal Service to advise him that Figmik was to have no further contact with appellant. Despite this, on November 8, 1991, Figmik had Martinez brought to the Marshal's cellblock to be debriefed further. Figmik claimed he had forgotten that he was not to have any further contact with appellant, but remembered after appellant was brought there and decided not to meet with him. Martinez claims that Valdez was brought to the same holding cell and was used to relay information between the two. Records show that Valdez had been transported to the cellblock the same day. Figmik denies that Valdez was used in this way and claims it was purely coincidental that they were there on the same day and placed in the same holding cell. Martinez claims that he was assured that he would get his deal, but must not tell his attorney. Figmik denies that Martinez ever asked for anything specific in return for the information beyond notifying both prosecutors of his cooperation which Figmik says he did.

When no Rule 35(b) motion was filed by the government, Martinez filed his motion for reduction or alternative motion to compel the government to do so. A two-day hearing on that motion was held before Magistrate Judge William C. Turnoff. *See* Supp.R. 2-1-621. In his thorough Report and Recommendation, the magistrate judge found that both Martinez and his attorney had been advised by the U.S. Attorney's Office that no deals would be made with appellant. He further found, and appellant conceded, that Figmik had not been authorized by the U.S. Attorney's Office to make such a deal and that no writing memorializing the alleged deal existed. The only promise the magistrate judge found to have been made was that Figmik would bring Martinez's cooperation to the attention of the prosecutors. Thus, he found no enforceable agreement to reduce appellant's

sentence. In reaching his decision, the magistrate judge relied on our opinion in *United States v. Kettering,* 861 F.2d 675 (11th Cir.1988) which essentially held that the government could only be bound by promises made by an agent authorized to make such promises and upon which a defendant detrimentally relies. Again, the magistrate judge not only determined that Figmik had made no promises other than to bring the cooperation to the attention of the AUSA, but further found that even if he did, he was not authorized to, and that because Martinez had already been convicted and sentenced by Judge King in the present case, he could show no detrimental reliance on any promise made. Finally, the magistrate judge noted that he found the contact between Figmik and appellant without appellant's counsel present "disquieting" even though the contact was unrelated to any pending prosecution in which appellant was involved. That determination, however, he found immaterial to the issue before him.

Martinez filed objections to the Report and Recommendation stating that crucial facts were omitted, the Report was contrary to the evidence, the magistrate judge's credibility findings were contrary to the evidence, and his application of *Kettering* was incorrect. After hearing oral argument, considering the extensive briefs filed by both Martinez and the government, and conducting an independent review of the record, Judge King affirmed the Report and Recommendation and denied appellant's motion. It is from this denial that Martinez appealed.

On appeal, appellant argues in his principal and reply brief that this Court should order the government to file a Rule 35(b) motion because of the "negligence and chicanery" in which the government engaged. In its brief, the government interpreted appellant's claim as one for specific performance of the alleged twenty-three year reduction in appellant's sentence and proceeded to spend much of its brief arguing that the lower courts' factual determinations that there was no deal and credibility determinations were not clearly erroneous and that, in any event, based on *Kettering,* anything promised by Figmik without the authorization of the U.S. Attorney's Office was unenforceable. In his reply brief, Martinez states that the government misinterprets his position:

> Appellant's position is *not* that the government specifically perform by recommending that Appellant receive a five year sentence. Instead, Appellant's position is that the government

42

be ordered to file a Motion pursuant to Fed.R.Crim.P. 35 due to the fact that the government [systematically] eliminated defense counsel from meetings between the Marshal and Appellant despite a promise from the prosecutor that no such *ex parte* contacts would occur.

Appellant's Reply Brief at 2. Martinez goes on to argue that "the Government's *ex parte* contact with the Appellant prejudiced this represented defendant by precluding him from being able to appropriately negotiate for a sentence reduction based on his uncounseled cooperation." *Id.* at 6. Appellant bases his argument on the Ninth Circuit's decision in *United States v. Treleaven,* 35 F.3d 458 (9th Cir.1994). Therein, the Ninth Circuit held that improper *ex parte* contacts with a represented defendant required vacating his sentence and remanding to the district court for determination of whether a downward departure was warranted despite the fact that the government had filed no motion under U.S.S.G. § 5K1.1. At his plea proceedings, the defendant had made an unequivocal offer through defense counsel to testify against a co-defendant in return for a downward departure. That offer was refused. The government, thereafter, contacted the defendant without notifying his attorney and secured his testimony against the co-defendant. The Ninth Circuit found that the defendant testified "apparently assuming that his lawyer had reached the prosecutor and that the government would move for the downward departure mentioned in the plea proceedings." *Id.* at 460. In reaching its decision, the Ninth Circuit noted that "no cases have squarely addressed" the situation. *Id.* at 462. We note that no courts have followed the decision.

Following the filing of its brief in which it steadfastly denied appellant's entitlement to a Rule 35(b) motion, and for reasons it has failed to explain, the government filed such a motion. In the motion, the government stated that it considered appellant's cooperation and assistance "substantial" and recommended that appellant's sentence be reduced by three years, that is to twenty-five years. Thereafter, the government filed a motion to dismiss this appeal as moot and remove it from our argument calendar in as much as Martinez had received the exact relief he was requesting: a Rule 35(b) motion. We denied that motion. At oral arguments, however, we raised the question to appellant's counsel of whether the government was correct in arguing that appellant's claims were remedied by the filing of the motion. Counsel argued there, and in appellant's

43

supplemental brief filed after oral arguments, that it clearly was not because Martinez was now in a worse position than before the government filed the motion. Appellant argues that the thrust of his claim has always been that the government's systematic exclusion of counsel from cooperation negotiations deprived him of the opportunity to negotiate an enforceable reduction in his sentence that reflected the true magnitude of his client's assistance.

> There is no question but that the Defendant and counsel would have negotiated a far more positive arrangement than a Rule 35 with a three (3) year recommendation had counsel not been excluded in the first place. Appellant should not be forced to appear before the District Court at a Rule 35 hearing handicapped by a deficient *post hac* Motion he would not have had to contend with or explain had counsel not been improperly excluded *ab initio.*

Appellant's Supplemental Memorandum of Law at 1-2. As a result, Martinez proposes two remedies: 1) Remand with instructions that appellant is entitled to a Rule 35(b) reduction and direct the district court to conduct a hearing to determine the amount of reduction counsel would have been able to secure had he not been excluded; or 2) Order the government to file a Rule 35(b) motion without limitation because "[p]lainly such a motion is the least counsel could have obtained for Appellant had counsel not been unconstitutionally excluded from the cooperation process." This, we believe, accurately summarizes the parties' positions as they currently stand.

First, although Martinez apparently is no longer basing his claim on this argument, for the sake of clarity and comprehensiveness we have carefully reviewed his claim that he was promised a twenty-three year reduction in his twenty-eight year sentence as well as the magistrate and district judges' findings that no such promise was made. After careful consideration, we are not prepared to say that the district judge's factual determination that no specific promise of a sentence reduction existed was clearly erroneous. *See Kettering,* 861 F.2d at 677. In conducting such a review, we are cognizant of "the advantages possessed by the trial court in appraising the significance of conflicting testimony" and that "an appellant court should be especially reluctant to disregard a district court's credibility choices." *Id.* (internal citations and quotation marks omitted). In the end, the determination of what exactly went on at these meetings must necessarily come down to the credibility of the persons offering the conflicting accounts. Martinez's contention that he was able

to negotiate a twenty-three year reduction in his sentence in this case when the AUSA in charge had unequivocally stated his lack of interest in dealing with him in any way is palpably unbelievable. While we confess our own distress, as did the magistrate judge below, with the actions and explanations of the government, especially those of Marshal Figmik, in this matter, there is simply no basis to say that the district judge's findings that the government's version of the events and promises made was correct were clearly erroneous. Thus, the determination that the only promise made to Martinez by the government was to inform both prosecutors of appellant's cooperation stands.

We next turn to what Martinez characterizes as his central proposition: "Had the government not breached its December 1990 promise to stop all contact with Appellant, counsel would have been in a position to attempt to negotiate an agreement with both the prosecutor in the King and the Hoeveler cases." Appellant's Reply Brief at 4. We find that Martinez received the exact relief, albeit late, that he was seeking from this Court and, thus, we need not determine whether he would have been entitled to a reduction if the government had not filed for one. In his principal brief, appellant plainly stated:

> In sum, because the prosecutor promised defense counsel he would stop all meetings but later authorized meetings which lead to the disclosure of critical information, the Government is duty bound to file a Motion pursuant to Fed.R.Crim.P. 35(b), in this case.

Appellant's Brief at 22. That is exactly what Martinez got.

That leaves only the issue of whether the government should be prohibited from making a recommendation as to the amount of reduction Martinez should receive. Assuming for the moment, without of course deciding the issue, that appellant would have been entitled to a reduction even if the government had not filed for one, we see no reason why the government should be prohibited from making its recommendation. Nowhere in his principal or reply brief did Martinez take the position that the government should not have been able to recommend what it believed to be an appropriate reduction. Counsel's argument in the supplemental brief that trial counsel would have been able to secure a greater reduction than that recommended by the government had he been

45

present, and therefore the government's recommendation should not be heard, is at best speculative. There is no basis to believe that Martinez would have received more than a three year reduction in his sentence in this case when, as we have already stated, AUSA Kaiser, who was in charge of this prosecution, was in no way interested in dealing with him. What appellant might have been able to negotiate with AUSA Mullaney regarding the prosecution proceeding before Judge Hoeveler is of no consequence. Further, as a practical matter, appellant's proposed remedy of instructing the district judge to conduct a hearing to determine what counsel would have been able to negotiate is simply unworkable. We cannot conceive, and Martinez has not suggested, how the district judge could determine this beyond merely guessing, something we are not prepared to require him to do.

We have found no misconduct on the part of the government prosecutors in this case and thus find no basis to ask the government to stand silent regarding what reduction it believes that Martinez is entitled to based upon the level of his cooperation. The government stated in its motion that it considered Martinez's cooperation "substantial" and appellant remains free to argue to the district judge that the magnitude of his assistance in capturing the notorious fugitive entitles him to a greater reduction than what the government recommends.

IX. New Trial

A. Garcia's Airplane Ticket

Garcia claims he is entitled to a new trial pursuant to Federal Rule of Criminal Procedure 33 based upon newly discovered evidence. He contends that the government intentionally failed to turn over an airline ticket that showed that Garcia returned from the Bahamas to Florida on May 28, 1988, via airplane and not as captain of the *What's Up* for its first smuggling voyage. As a result, he argues, he is entitled to a new trial. In response, the government states that Garcia never presented his claim to the district court in the form of a motion for a new trial as required by Rule 33 and, in any event, such a motion would have been unsuccessful on the merits. In his reply brief, appellant admits that he did not move for a new trial on this ground when he states the following:

> In the Government's Brief they state that Mr. Garcia never presented his claim regarding the airline ticket to the district court in the form of a motion for new trial pursuant to the Federal

46

Rules of Criminal Procedure 33. The reason Mr. Garcia did not do this is because he was unable to locate this airline ticket.

Appellant Garcia's Reply Brief at 10.[10]

"The proper procedure for obtaining a new trial on the basis of newly discovered evidence is by a motion to the trial court." *United States v. Boberg,* 565 F.2d 1059, 1060 (8th Cir.1977); *see also United States v. Atkinson,* 512 F.2d 1235, 1239-40 (4th Cir.1975) ("We feel also that a motion for a new trial on the ground of after discovered evidence should more properly be made in the district court."). We have before us only appellant's unsubstantiated allegations and accusations of government misconduct. One of the principal rationales for the above quoted general rule is that the district court should have an opportunity to flesh such claims out before an appellant court is forced to render a decision without the benefit of the district court's factual determinations. Because appellant's claim is not properly before us, we decline to reach this issue. We do, however, note some conceptual difficulty in classifying this airline ticket as "newly discovered evidence." Surely appellant has known all along that he was a passenger on the flight and the existence of records somewhere documenting that fact, if indeed it is true. Any difficulty in obtaining those records from either the government or some third-party could have been easily rectified by bringing the matter to the attention of the district court. In other words, appellant, at first glance, would appear to have difficulty in establishing his "due diligence" as required to obtain a new trial on the basis of newly discovered evidence. *See United States v. Garcia,* 13 F.3d 1464, 1472 (11th Cir.), *cert. denied sub nom., Chaves v. United States,* 512 U.S. 1226, 114 S.Ct. 2723, 129 L.Ed.2d 847 (1994).

---

[10]Appellant did attempt to argue at his sentencing that he was not on board the *What's Up* during the return trip from the Bahamas because he flew back on May 29, 1990. The Court assumes appellant means May 29, 1988. In response, the government stated that the testimony of coconspirator Torres showed that Garcia was captain of the *What's Up* for the entire first trip and was paid an extra $150,000 for his services. It was undisputed that the jury heard no testimony otherwise. The district judge correctly ruled that "we cannot argue in this hearing that that did not occur." Supp.R. 1-12-29. The only other reference in the record that we can locate is appellant's motion to supplement the record on appeal with a copy of the airline ticket which was denied pursuant to Rule 10(e). Thus, the record demonstrates that the issue of whether appellant was entitled to a new trial based on these claims or the truthfulness of his assertions was never properly placed before the district judge.

B. Jury Contact

Appellants appeal the denial of their motions for a new trial based upon allegations of two separate incidents of improper contact with the jury.[11]  Because of Judge King's ruling that he was without jurisdiction to hear argument on the motions for a new trial, we have before us only the partisan allegations of the appellants and the government concerning what actually happened.  One of the alleged incidents involved a court security officer ("CSO") or possibly a Marshal and an unidentified juror.  The officer allegedly said to one of the jurors, in reference to the defendants, "These people are all pigs" or "They're all pigs" and "They must be like this at home."  The alleged exchange, which appellants claim occurred during a smoking break during deliberations, was apparently overheard by relatives of one or more of the defendants.  They informed two of defendants' attorneys who, in turn, informed the district judge presiding over the jury's deliberations, Judge Thomas E. Scott.  Judge Scott was then, according to appellants, seen reprimanding the officer and the juror on a balcony where smoking breaks were taken after the alleged contact was brought to his attention by one of the attorneys.

The other incident involved an alleged off-the-record meeting during jury deliberations between Judge Scott, AUSA Kaiser, Customs Agent Robinson, the jury foreman, and two defendants and their counsel.  This meeting, they claim, took place in Judge Scott's courtroom, not Judge King's where the trial had been held.  Garcia claims that he and his attorney were present for a short time, but were removed after "whispered conversation between Mr. Garcia's attorney and counsel for the government...."  Abella's and Garcia's Brief at 15.  Appellants allege that during this "informal exchange" "one or more of the verdict forms may have been exhibited to the District Judge, and one or more verdict forms may have been changed through erasures....  [T]wo of the defendants who had been present during this hearing with Judge Scott are the two defendants who

---

[11]Martinez, Abella, Garcia, and Caderno originally raised this issue before the court. Appellant Calderon joined in their arguments in a supplemental brief following oral argument of this appeal. Gamboa and Noa raised the issue in the district court below. Iglesias adopted all of his co-appellants arguments to the extent they are applicable to him.

48

were acquitted of the charges." *Id.* at 15-16. On May 21, 1990, the jury returned its verdicts convicting appellants. R. 16-12.

Judge King was first made aware of these allegations on July 9, 1990, when five appellants sent him a series of *pro se* letters in which they identified the alleged incidents of improper contact. On July 31, 1990, Judge King ordered all counsel to respond to the convicted defendant's allegations.[12] Thereafter, on August 22, 1990, Judge King entered an order in which he stated that "while this court has inquired into any possible wrongdoing in this action to satisfy itself of the propriety of the trial, no motion stands before the court for its resolution.... [T]he court is satisfied by its inquiry of the above mentioned matter, and defendants must raise any objections to their convictions on appeal or through procedurally correct motion." R. 2-285. On September 21, 1990, Abella filed a motion for a new trial claiming that Judge Scott had instructed the jury foreman how to organize the jury process. The motion included an affidavit of Garcia stating that Garcia's sister had informed him of the contact between Judge Scott and the jury foreman. Garcia filed a motion to adopt Abella's motion on the same day in which he included affidavits of Abella and Abella's wife. Garcia also filed a supplemental motion for a new trial based upon the CSO contact and attached an affidavit of Abella's wife who allegedly overheard the comments. On October 1, 1990,

---

[12]Counsel responded as follows: 1) Abella's counsel stated that he had been informed of the contact between the juror and CSO, but had no knowledge of the contact between Judge Scott and the jury foreman; 2) Caderno's counsel stated that he knew of the CSO contact, but not the contact with the jury foreman. Upon seeing the CSO contact, Caderno's counsel "and several of the other counsel for other Defendants placed the Court on notice of the observation. Judge Thomas Scott ... *immediately presented himself in the Courtroom* and the Court, upon inquiring about the situation, correctively administered instructions to the jurors and the Marshall's [sic] Office...." Supp.R. 1-2-277 (emphasis added). This is in direct contradiction to appellants' assertions that Judge Scott administered a reprimand on the smoking balcony; 3) Calderon's counsel stated that he had witnessed the CSO contact, but knew nothing of the contact with the jury foreman; 4) Gamboa's counsel responded that he knew of neither, but Gamboa filed a response stating that he had informed his counsel of the contact between the juror and the CSO on the day that it allegedly occurred, *See* R. 2-284; 5) Noa's counsel stated that he had been aware of neither alleged contacts. Neither Iglesias nor Martinez, individually or through counsel, responded. Finally, counsel for acquitted defendant Magley Duran, who was allegedly present at the "informal exchange" with Judge King, apparently stated that she had no recollection of the meeting. *See* Government's Supplemental Chronology of Events at 2. That response was not made a part of the record on appeal.

49

Garcia submitted the affidavit of Pablo Martinez Sr. who related his own account of the CSO contact and his observation of Judge Scott's reprimand of the CSO and juror. Supp.R. 1-1-332, Ex. B. On October 15, 1990, Garcia filed a second addendum which contained the affidavit of a private investigator who claimed that acquitted defendant Magley Duran told him that during the meeting in question the jury foreman "may have been there, but [she] couldn't be positive." Supp.R. 1-1-337-Ex. C. The private investigator further stated that, according to Duran, Judge Scott read aloud a question "to the effect that there was a verdict on eight of the defendants, and a problem with three of them. One of the three supposedly had a "hung jury.' " *Id.*

On January 28, 1991, the government filed its written response arguing that the motions should be denied as untimely because the facts underlying them had been known to appellants and their counsel prior to verdict and, despite this, they were filed more than seven days after the return of the verdicts contrary to Federal Rule of Criminal Procedure 33. The government also provided an affidavit of the CSO who had allegedly been seen talking to the juror in which he stated that he had not spoken to any juror during their deliberations and, further, that no juror left the eleventh floor to go to Judge Scott's courtroom while he was stationed outside the jury room. Supp.R. 1-2-416, Attach. Agent Robinson submitted his affidavit in which he stated that on May 18, 1990, Judge Scott did read a question from the jury and, thereafter, the parties agreed that the jury should be dismissed until May 21, 1990, the following Monday. *Id.* He further stated that, to the best of his recollection, no member of the jury was ever present. *Id.* In reply, Garcia admitted that at least two of the attorneys were aware of the contacts prior to the return of the verdicts, but still argued that Judge King should convene an evidentiary hearing.

On July 8, 1991, Judge King convened such an evidentiary hearing into the two contacts. Initially, the court focused on the allegation regarding an off-the-record meeting between Judge Scott and the jury foreman. The court attempted to determine whether appellants had waived their

presence at the reading of the question by, as was the local custom in multiple defendant cases,[13] agreeing to allow a few attorneys to stand in for the others when a question from the jury arises. *See* Supp.R. 1-9-29-57. The court's task was complicated by the fact that most, if not all, of the convicted defendants had retained different counsel than those appearing at trial. *Id.* Judge King determined that, as a threshold matter, the defendants must be able to establish, through testimony or affidavits, that neither the defendants nor their trial counsel waived the right to be present for the reading and answering of the jury's question. Since their motion made no factual allegations one way or the other on that point, Judge King severed that part of the motion for a new trial and gave the defendants thirty days within which to provide sworn testimony to that effect. Judge King then announced that he would consider the allegations of improper contact by the CSO following a recess in the proceedings. Upon return, however, the government was allowed to raise its legal argument that the court was without jurisdiction to hear the motions because they were filed more than seven days after the return of the verdict contrary to the requirements of Rule 33. In response, defense counsel argued that under this circuit's decisions, matters of jury impropriety are always treated as motions for new trial based upon newly discovered evidence that would permit the filing of a motion for a new trial up to two years following return of a verdict. After hearing these arguments, Judge King stated

> I think under the circumstances that the motion just comes to[o] late. It was well known to everybody. It had to have been well known to everybody at the time that these matters occurred and they should have been raised promptly. They should have been raised right then and there if there [were] any objection[s].... Raising it later comes at a time when it lays it all in a difficult evidentiary posture and really second guesses the jury. The motion is granted, the motions are stricken for failure to comply with Rule 33.

Supp.R. 1-9-75-76. In his written order, Judge King reiterated that he believed all defendants knew of the incidents prior to return of the verdicts:

---

[13]Judge King discussed extensively the prevailing local custom of the defense bar in the Southern District of Florida that allows attorneys in multiple defendant cases to agree that fellow defense counsel will stand in for them during jury deliberations. Supp.R. 1-9-29-57. Judge King reasoned that given all the procedures that a criminal defendant or his counsel could waive, if the defendants or their counsel had waived being present during jury deliberations, they could not be heard now to complain that they were not present. *Id.*

> The court finds that the defendants in this case had knowledge of the alleged incidents prior to the return of the jury verdict. They had the option of filing a motion for a new trial, but, other than calling former Judge Thomas E. Scott's attention to one of the alleged incidents, they apparently chose inaction.

Supp.R. 1-2-484.

Our inquiry then must begin with whether appellant's motions for new trial based on these alleged improper contacts were properly before the district court. Rule 33, in relevant part, provides:

> The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment.... A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7-day period.

Appellants are correct in their assertion that a motion for new trial based on juror irregularities has been historically treated in this circuit as a motion for new trial based on newly discovered evidence. *See United States v. Bolinger,* 837 F.2d 436, 439 (11th Cir.), *cert. denied sub nom. De La Fuente v. United States,* 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988). That, however, does not mean that appellants automatically have two years within which to file such a motion. It is more than obvious that, by its very terms, a motion for a new trial based upon newly discovered evidence must not be based on evidence or incidents of which appellants had knowledge prior to return of the jury verdict. *United States v. Jones,* 597 F.2d 485, 489 (5th Cir.1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 729, 62 L.Ed.2d 728 (1980). Moreover, appellants have the burden of establishing in their motions that the evidence was in fact newly discovered and that failure to discover it prior to verdict was not due to a lack of due diligence. *Id.* If appellants can not make such a showing, their motions should be denied. *Id.*

We turn first to the contact alleged to have taken place between the CSO and a female juror in which it is claimed that the CSO referred to appellants or their families as "pigs." Judge King determined that this alleged incident was known to the parties before the jury verdict was returned. That conclusion is supportable from the record before us. It discloses that several of appellants' counsel had either witnessed the exchange or been made aware of it as well as the substance of the comments. At least one of the appellants, Gamboa, learned of the contact on the day it occurred and

claimed to have informed his attorney that day. Finally, several of the appellants' family members heard the exchange and brought it to the attention of "several" defense counsel who, in turn, informed Judge Scott. Appellants' assertion that Judge Scott then reprimanded the CSO and juror on the balcony is in direct contradiction to Caderno's trial attorney's specific statement that the reprimand took place in the courtroom and was directed toward the entire jury and Marshal's Office. Even assuming that both the derogatory statements and the *ex parte* reprimand occurred, under appellants own accounts, they were both widely known to defense counsel. The appropriate course of action would have been to bring their objections to the attention of Judge Scott on-the-record, inform Judge King of them at the earliest possible time, or move for a mistrial immediately. It is simply unreasonable to suggest that news of such an incident, if indeed it occurred, did not quickly spread to all appellants and all counsel. Further, even were we to believe that one or two of the appellants or their counsel were not aware of the contact, they must still overcome the burden of establishing that in the exercise of due diligence they would not have discovered it. *Jones,* 597 F.2d at 489; *see also United States v. Dean,* 667 F.2d 729, 732-34 (8th Cir.) (en banc) (holding that untimely notification of juror misconduct waives right to new trial even where actual prejudice can be shown), *cert. denied,* 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982). This they can not do given the widespread knowledge by fellow defense counsel and appellants of the incident long before the jury verdict was returned. Thus we find that the district court committed no error in denying the motion for a new trial based upon this alleged contact.

We turn now to the allegation that Judge Scott engaged in an off-the-record exchange with the jury foreman in the presence of only two defendants and the prosecutor. As we noted above, Judge King had attempted to ascertain whether appellants or their counsel had waived their presence during the reading of routine jury questions as was the custom in the Southern District. Finding their motion void of any factual allegation one way or the other, the court gave appellants thirty days within which to provide such evidence which he ruled was prerequisite to proceeding on their claim. Shortly thereafter, however, he ruled that he was without jurisdiction to hear the claim based on Rule

33 and denied the motions. That ruling apparently implicitly vacated his earlier ruling giving appellants thirty days to present evidence on the waiver issue. Unfortunately, neither Judge King's written or oral ruling answered the key question of whether in fact the jury foreman was ever present in Judge Scott's courtroom for an off-the-record meeting, much less addressed the serious accusation that Judge Scott viewed partially completed verdict forms and improperly allowed them to be changed by erasure in his presence. The first question before us, however, is whether Judge King's denial of the motions as untimely as to some or all of appellants was incorrect.

With regard to Garcia, the answer is easy. Assuming for the moment that appellants allegations are true, by all accounts Garcia was present during this alleged incident, at least for a short time. Thus, he obviously would have known of the factual basis upon which his motion for a new trial was based prior to the return of the jury's verdict. Garcia, however, argues that he did not appreciate the legal significance of what he claims he witnessed. That argument has been soundly rejected in the context of ineffective assistance of counsel claims. *See, e.g. United States v. Ugalde,* 861 F.2d 802, 806 (5th Cir.1988), *cert. denied* 490 U.S. 1097, 109 S.Ct. 2447, 104 L.Ed.2d 1002 (1989) ("Rule 33 on its face requires that the evidence itself, not merely the legal implications of the evidence, be "newly discovered.' "). Cases such as *Ugalde* make it clear that to get the benefit of the two-year time limit of Rule 33, the factual evidence itself, not the unappreciated legal significance of those facts, is what must be unknown to a criminal defendant prior to the return of the jury verdict. If those facts are known, as is the case here, then a motion for a new trial must be made within seven days despite the "practical difficulties" such a rule presents to defendants. *Id.* That rationale applies with equal force to the claim before us.

With regard to the other appellants, the question is closer. We must agree that Judge King's rulings provide no factual basis for his determination that these appellants knew of the alleged improper contact with the jury foreman prior to the return of the jury's verdict. However, we have reviewed the transcripts that cover the time during which Judge Scott presided over this jury's deliberations. That review uncovered a series of *on-the-record* exchanges between Judge Scott,

54

various defense lawyers, and the government regarding a jury question, the substance of which is identical to the question that Duran told the private investigator that Judge Scott read aloud. R. 16-1-22. Neither the government nor defense counsel directed our attention toward this transcript which we believe sheds welcome light on appellants' allegations.[14]

According to that transcript, on May 21, 1990, Judge Scott called the court to order to consider a jury question. Present along with Judge Scott were AUSA Kaiser and "various defense counsel representing the defendants." R. 16-3.[15] Counsel waived the presence of defendants for the reading of the note. *Id.* Judge Scott informed the parties of the following:

> We have received a copy of the note which I directed Friday to my law clerk and Court Reporter. "Your Honor, if jurors are unanimous in some counts and not unanimous in other counts, does that mean on any specific defendant we have reached a verdict or is this considered a deadlocked decision? Please let us know to re-examine. Respectfully submitted Victor Maturo, foreperson.["]

*Id.*; *See also* R. 2-224 (Minutes indicating consideration of question continued from May 18, 1990, until May 21, 1990, with photocopy of jury's question attached and court's answer). Again, this is the precise question that Duran related to the private investigator. It is also consistent with Customs Agent Robinson's Affidavit indicating that the jury sent out a question on May 18, 1990. Judge Scott received the question on May 18, but apparently decided to send the jury home for the weekend and take it up with defense counsel on May 21. After discussion, the parties agreed on an answer of "[k]eep deliberating." R. 16-4. Judge Scott then suggested "why don't you all split for lunch? I will see you back [at] 1:00. If I get another note, I will give them lunches until 1:00." *Id.*

---

[14]In their Supplemental Brief, Abella and Garcia state that "[t]he defense has always contended that there are transcripts missing.... The contact with Judge Scott and the jury foreperson also had a court reporter present, yet there is no transcript of this proceeding either."

[15]Earlier transcripts disclose that several defense attorneys had indeed requested that Judge King allow them to "stand in" for each other during the jury's deliberations due to the attorneys' commitments in other courts. R. 15-62-63. In response to the requests Judge King stated that "[a]ll I need is somebody here to be able to answer the questions that the jury sends out and as long as you all agree on whatever answers that we all agree on that are here, that is fine. Just designate somebody to represent your client in answering those questions." *Id.*

Later that afternoon, court was reconvened by Judge Scott with all defendants present with their counsel with the exception of attorney Frank Rubino. *Id.* at 5. Another attorney agreed to stand in for him. The jury was brought in and the foreperson, Victor Maturo, was asked to identify himself. He was asked whether the jury had been able to reach a "unanimous verdict on all counts on all defendants." *Id.* When he answered "no," Judge Scott instructed him to pass the completed verdict forms to the judge. The jury was then sent out and Judge Scott reviewed the verdict forms. He informed the parties, without of course revealing their specific identities, that there was one defendant against whom the jury had not returned any verdict and two others the jury had been able to return only partial verdicts against. After discussion with defense counsel, Judge Scott brought the jury back in and gave them the following instruction:

> I am going to receive the eight [completed] verdicts and seal those. I am going to ask you to continue deliberations on the remaining three, but I'm going to further indicate if you all think you cannot arrive at a verdict or you have a problem as to those three, write me a note and tell me what the situation is.... These three [verdict forms] I am going to give back to you. You may consider them completely. You can change your minds. You can do whatever you want. Its completely in your ballpark. You do whatever you want to do. You can change your minds. You can stay on the same. Let me know where you stand somehow [in] the next few moments.

R. 16-8. Shortly thereafter, the jury sent word that they were unable to resolve their differences of opinion with regard to the charges against the three defendants. After more discussion with counsel, Judge Scott agreed that it was pointless to ask the jury to continue deliberating. He brought the jury in, confirmed with the foreman that the jury was unable to reach a verdict as to the three defendants, and proceeded with reading of the verdicts and the polling of the jury.[16] *Id.* at 13-22.

After careful consideration, we are satisfied that this is the only contact that Judge Scott had with the jury concerning their inability to reach a verdict on the three defendants. The initial morning discussion of the jury's question is entirely consistent with Magley Duran's account of what

---

[16]If appellants' claim is that during the alleged secret meeting that Judge Scott and the jury foreman changed the verdict forms to reflect a verdict inconsistent with the rest of the jury members' votes, the polling provided them the opportunity to make that known. Each jury member, however, indicated that the verdicts were correct as read. In addition, we have reviewed the eight verdict forms that pertain to appellants. They are all completed in ink and show no attempted alteration by erasure or otherwise.

transpired and the fact that within a couple of hours the jury ceased its deliberations. It may well have been that during this time not all counsel were present. That would be consistent with defense counsels' on-the-record request of Judge King that they be allowed to "stand in" for one another that we cited above. It is clear from the transcript, however, that Judge Scott's consideration of the question and his contact with the jury foreman were both on-the-record. Judge Scott consulted with defense counsel and his handling of the question comported with the agreement of the parties. He was not shown any verdict forms until the afternoon of May 21 and this too occurred on-the-record and in the presence of *all* defendants and their counsel with the exception of Rubino. Indeed, in Caderno's motion for an evidentiary hearing, he claims that he "witnessed the Honorable Judge Thomas Scott instruct the Jurors to "erase or make any changes on the verdicts.'" Supp.R. 1-1-292. That statement alone, even without the benefit of transcript, undermines appellants' core claim that only the jury foreman and two acquitted defendants were present before Judge Scott when the verdict forms where shown to him. While appellants may not believe that Judge's Scott's decision to view the verdict forms and allow deliberations to continue on the other three defendants was correct, nothing about it warrants a new trial. In any event, the eight verdict forms that we now know pertained to appellants were sealed immediately upon Judge Scott's receipt of them and before the jury was sent back to attempt further deliberations on the other three defendants. Thus, the eight convicted defendants now before us certainly were not prejudiced by the continued deliberations.

From our review of appellants' assertions and the entire record, we find no credible evidence that a clandestine meeting of the type alleged by appellants, ever took place. First, we find it unlikely that news, if true, of such a meeting did not spread quickly from Garcia and his trial counsel to the other defendants and their attorneys congregated in the courthouse. Again, all defense counsel, with the exception of Rubino, were present in the courthouse and were all well aware of the jury's deliberation difficulties. In seeking a remand for an evidentiary hearing into what transpired on that day and who knew what when, as a practical matter, appellants ask the impossible. It is highly unreasonable to expect that the persons involved who could give a credible account of

57

what transpired on that day (i.e. Judge Scott, trial counsel, and the jurors) would have any recollection here nearly seven years later. If appellants possessed or discovered some concrete evidence that their allegations of a secret meeting of which appellants knew nothing about were true, such as affidavits of trial counsel who were actually present, they should have filed a motion for reconsideration with Judge King informing him of it and giving him the opportunity to make further inquiries.

Appellants have simply not provided sufficient proof in their affidavits, which we have carefully reviewed and considered, that anything occurred that would in any way warrant a remand much less a new trial. Appellants rely on their own self-serving affidavits to establish that the incident took place. They are totally unsubstantiated by any objectively credible source and, in many respects, are undermined by the inconsistencies in their various accounts of what transpired. At the very minimum, we would expect that Garcia's trial counsel, who was allegedly escorted from the courtroom, would have supplied an affidavit confirming these accusations. The closest thing we have to an eyewitness account of the incident is the second-hand information contained in the affidavit of the private investigator supposedly given to her by Duran. As we have stated, that account is consistent with the proceedings detailed above. In any event, we see no reason to remand this for further inquiry and certainly do not believe that a new trial is warranted.

X. Conclusion

For the foregoing reasons the convictions and sentences of each appellant are AFFIRMED.