[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 19, 2011
JOHN LEY
CLERK

No. 11-12187
Non-Argument Calendar

_____

D.C. Docket No. 2:10-cr-14094-JEM-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ELIAS ALVARADO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 19, 2011)

Before HULL, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

After a jury trial, Elias Alvarado appeals his conviction and sentence for possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). On appeal, Alvarado challenges: (1) the sufficiency of the evidence supporting his conviction; (2) the denial of his motion to substitute counsel at sentencing; and (3) the imposition of an obstruction-of-justice sentencing enhancement based on his perjured trial testimony. After review, we affirm Alvarado's conviction and sentence.

## I. BACKGROUND FACTS

A grand jury indicted Defendant Alvarado with conspiracy to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846 (Count 1), and possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count 2). The indictment also charged co-defendant's Victor Rodriguez, Juan Sanches and Adolfo Armenta. Alvarado's co-defendants pled guilty, and Sanches and Armenta testified against Alvarado at trial.

### A. Government's Evidence at Trial

Beginning in late October 2010, two confidential sources, working for the Port Saint Lucie Police Department, met with Victor Rodriguez and Juan Sanches ostensibly to purchase cocaine from them. Rodriguez and Sanches then tried

unsuccessfully to have cocaine delivered to Port Saint Lucie, Florida. Sanches eventually found a man in North Carolina named "Chino" who said he could deliver four kilograms of cocaine to Florida. Chino told Sanches he would send "the guys" with the delivery on the weekend. Chino and Sanches agreed the drug transaction would occur at a McDonald's restaurant. Chino gave the delivery men Sanches's phone number to call when they got close.

In North Carolina, Chino recruited Adolfo Armenta to drive the cocaine to Florida and told him someone else would come along with him. On the day Armenta was to drive to Florida (November 21, 2010), Chino instructed Armenta to go to an exit off of a highway. There, Defendant Alvarado met Armenta and took him to a house where Chino was waiting outside.

While Defendant Alvarado stood near the passenger-side door of Armenta's Isuzu Trooper, Chino gave Armenta two packages of cocaine and a bag to put them in. Armenta put the bag with the cocaine in his Isuzu Trooper. Chino put a third package of cocaine in a driver's side compartment in the rear of the Trooper. Defendant Alvarado then placed his own bags in the Trooper. Chino told Defendant Alvarado, "Well, you know what you have to do already. Go on and leave because it is already very late." Chino told Armenta that all he had to do was drive. According to Armenta, Defendant Alvarado was supposed to handle

3

the exchange of drugs for money.

During the November 21 drive to Florida, Defendant Alvarado gave Armenta directions. Chino called Defendant Alvarado every two hours to ask how everything was going. During one call, Chino told Defendant Alvarado that the buyers were waiting and gave Alvarado a phone number. Defendant Alvarado relayed the number to Armenta and told Armenta they were thirty or forty minutes away. While Defendant Alvarado continued to speak with Chino, Armenta called the number and told Sanches that they were very close by.

About thirty minutes later, Armenta and Defendant Alvarado arrived at the McDonald's parking lot, which was under surveillance by law enforcement. Sanches, Rodriguez and the two confidential sources were waiting outside. As the Isuzu Trooper pulled in, Sanches signaled with his hand, and Defendant Alvarado nodded his head in acknowledgment. Defendant Alvarado said, "That's them, that's them. Those are the ones," and told Armenta to park. Defendant Alvarado said he was getting out to talk to the men and use the restroom. While Armenta waited in his vehicle, Defendant Alvarado exited the vehicle and entered the McDonald's. At that point, law enforcement arrested Armenta, Alvarado, Sanches and Rodriguez. A search of Armenta's Isuzu Trooper revealed the cocaine.

Phone records showed numerous calls among Defendant Alvarado, Chino

and Armenta. Incoming and outgoing calls between Chino's two phones and Defendant Alvarado's phone began on October 28, 2010, and continued until November 21, 2010. From November 18 to 21, Defendant Alvarado's phone called one of Chino's phones 37 times and the other phone 11 times. One of Chino's phones called Defendant Alvarado's phone 70 times. Alvarado's phone called Armenta's phone 6 times between November 14 and 18. Armenta's phone called Chino's, Sanches's and Alvarado's phones multiple times. On November 21, the day of the cocaine delivery, Chino's two phones called Defendant Alvarado's phone 44 times.[1]

## B.   Defendant Alvarado's Testimony

Testifying in his defense, Defendant Alvarado claimed that he was merely riding as a passenger in Arementa's vehicle and did not know anything about the cocaine. According to Defendant Alvarado, he met Chino in Texas in late October at a neighbor's house. Alvarado and Chino agreed to travel together from Texas to North Carolina to find work. They arrived in North Carolina on November 13 or 14, 2010, where Chino introduced Defendant Alvarado to Armenta. Within a few days, the three men decided to return to Texas to pick up a car for Armenta.

---

[1]At trial, Alvarado moved for a judgment of acquittal on both counts after the government's case-in-chief. The district court denied the motion.

On the return trip to North Carolina, Chino told Defendant Alvarado that he wanted Alvarado to go with Armenta to Port Saint Lucie, Florida, and put the car in Alvarado's name. Alvarado did not agree, but decided to ride with Armenta to Florida. The men arrived back in North Carolina on November 19 and stayed at Armenta's house. Defendant Alvarado said that he did not see any cocaine and that neither Armenta nor Chino told him they were delivering cocaine to Florida.

On November 21, 2010, Armenta drove the Isuzu from North Carolina to Florida. During the drive, Defendant Alvarado spoke with Chino only twice and never spoke to Sanches. Armenta spoke with Chino on his own phone and also on Alvarado's phone. When the government pointed out that phone records showed that Alvarado was talking to Chino at the same time Armenta was talking to Sanches, Alvarado said that Armenta used Alvarado's phone on loud speaker while speaking to someone else on his own phone.

When they pulled into the McDonald's parking lot, Armenta told Defendant Alvarado they were stopping to eat. Alvarado claimed he was surprised when they were arrested because he did not know what was going on.

Following Alvarado's testimony, the defense rested and renewed Alvarado's motion for a judgment of acquittal. The district court again denied the motion. The jury found Alvarado guilty as to Count 2, but did not reach a verdict as to

Count 1.  The district court declared a mistrial as to Count 1.

**C.      Presentence Investigation Report**

The Presentence Investigation Report ("PSI") recommended an advisory

guidelines range of 78 to 97 months' imprisonment, based on a offense level of 28

and a criminal history category of I.  The PSI did not recommend a two-level

obstruction-of-justice enhancement, but noted that the government believed

Alvarado had provided false testimony at trial.  The PSI stated that the district

court was in the "best position to determine" whether Alvarado's conduct

obstructed justice for purposes of the enhancement.

Alvarado filed numerous objections to the PSI, including, inter alia, the

PSI's recitation of the offense conduct and the failure to give a minor-role

reduction and relief from the statutory mandatory minimum sentence under the

safety-valve provision.

**D.      Pro Se Motion to Substitute Counsel**

After filing PSI objections, but before the sentencing hearing, Alvarado

filed a pro se motion asking the district court to appoint new counsel to represent

him at his sentencing.  In the motion, Alvarado stated that his trial counsel: (1) did

not spend enough time discussing Alvarado's case or let Alvarado fully relay his

side of the events that had transpired; (2) failed to review discovery with

Alvarado; (3) did not investigate leads or witnesses that would have shown Alvarado's innocence; (4) did not take Alvarado's phone calls; and (5) behaved in an unprofessional and belligerent manner when Alvarado "expressed [his] feelings on [counsel's] defense tactics."

Alvarado's trial counsel then filed a motion for leave to withdraw as appointed counsel. In his motion, Alvarado's trial counsel stated that Alvarado had accused him of unethical and unprofessional conduct, which could possibly give rise to an actual conflict of interest, and noted that "the attorney/client relationship is not only incompatible, but apparently non-existent."

## E.    Sentencing

At the outset of the sentencing hearing, the district court denied Alvarado's pro se motion for substitute counsel and his trial counsel's motion to withdraw. The court stated that defense counsel had done a good job representing Alvarado and appeared to be filing all the appropriate motions for the sentencing hearing.

With regard to his sentence, Alvarado objected, in relevant part, to an obstruction-of-justice enhancement. Alvarado maintained that he testified only to his recollection of the events surrounding his drive to Florida and should not receive the enhancement merely because he testified.

The district court overruled Alvarado's objection. The district court stated

that it "would not have been amenable to" imposing the enhancement if Alvarado had merely denied that he had done anything wrong. But, "the details of [Alvarado's] alternate universe that he testified about at the trial" seemed to the district court "to be not founded in any . . . basis other than this is a good story." The district court noted Alvarado's testimony that Armenta drove down the highway while talking simultaneously on two different phones was "near ludicrous." The district court found that Alvarado's testimony contradicted the physical facts of the case, including the telephone records.

With the addition of an obstruction-of-justice enhancement, Alvarado's advisory guidelines range became 97 to 121 months' imprisonment. The district court imposed a 100-month sentence. Alvarado filed this appeal.

## II. DISCUSSION

### A. Sufficiency of the Evidence

In reviewing the sufficiency of the evidence, "we will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." United States v. Hill, 643 F.3d 807, 856 (11th Cir. 2011) (internal quotation marks omitted).[2] Further, a defendant's own

---

[2]We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences and resolving all credibility questions in the verdict's favor. United States v. Hill, 643 F.3d 807, 856 (11th Cir. 2011).

9

testimony can undermine a sufficiency challenge to the evidence presented at trial. See United States v. Mateos, 623 F.3d 1350, 1362 (11th Cir. 2010), cert. denied, 131 S. Ct. 1540 (2011). "A defendant who chooses to testify runs the risk that the jury will disbelieve [his] testimony" and instead conclude that the opposite of his testimony is true. Id. This risk is especially high when a case turns on subjective elements, such as the defendant's intent or knowledge. Id.

To secure a conviction under 21 U.S.C. § 841(a)(1), the government had to prove that Alvarado "(1) knowingly (2) possessed cocaine (3) with intent to distribute it." See United States v. Faust, 456 F.3d 1342, 1345 (11th Cir. 2006) (quotation marks omitted). The defendant's "[p]ossession may be either actual or constructive." Id. A defendant has constructive possession by maintaining "dominion or control over the drugs or over the premises where the drugs are located." Id. (quotation marks omitted). "Constructive possession can be established by either direct or circumstantial evidence and by inferences arising from the surrounding circumstances." Id. at 1345-46.

The trial record contains ample evidence from which a reasonable jury could conclude that Alvarado knowingly possessed cocaine with the intent to distribute it. It is undisputed that Alvarado traveled from North Carolina to Florida in a vehicle carrying three kilograms of cocaine. The testimony of

10

Armenta (Alvarado's co-defendant) established that Alvarado knew the cocaine was in the vehicle, that Alvarado had constructive possession of the cocaine while they traveled to Florida and that Alvarado intended to sell the cocaine.

According to Armenta, Alvarado stood by while Chino and Armenta loaded the cocaine into a bag and concealed it in the Isuzu and Chino told Armenta that Alvarado would handle the transaction when they arrived in Port Saint Lucie. While they drove, Alvarado was constantly on the phone with Chino, Alvarado told Armenta where to go, and Alvarado told Armenta to call Sanches and reassure him that they would arrive soon. When they arrived, Alavarado acknowledged Sanches and Rodriguez with a nod, told Armenta he would talk with them and got out of the vehicle, while Armenta remained in the vehicle with the cocaine.

While Alvarado testified that he never saw the cocaine and did not know they were delivering cocaine, the jury was entitled to disbelieve him, which they obviously did. Moreover, Alvarado's discredited testimony is further evidence of his guilt. The evidence, viewed in the light most favorable to the government, is more than sufficient to support the jury's verdict on Count 1.

**B.      Motion for Substitute Counsel**

A defendant has a right to counsel, but not an unqualified right to the appointed counsel of his choice. Therefore, an indigent defendant has no right "to

11

demand a different appointed lawyer except for good cause." United States v. Garey, 540 F.3d 1253, 1263 (11th Cir. 2008) (en banc).  Good cause for substitution of counsel exists where there is "a fundamental problem, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." Id. (quotation marks omitted).  Because good cause for substitution of counsel cannot be solely based on a defendant's perception, a defendant's general loss of confidence or trust in his counsel, standing alone, is not sufficient.  Thomas v. Wainwright, 767 F.2d 738, 742 (11th Cir. 1985).[3]

In reviewing a district court's denial of a motion for new counsel at sentencing, we consider: "1) the timeliness of the motion; 2) the adequacy of the court's inquiry into [the] merits of the motion; and 3) whether the conflict was so great that it resulted in a total lack of communication between the defendant and his counsel thereby preventing an adequate defense." United States v. Calderon, 127 F.3d 1314, 1343 (11th Cir. 1997).  Even if the district court abused its discretion in denying the motion, the error is harmless unless the defendant shows "that, in the context of the sentencing hearing, he was somehow prejudiced by trial

---

[3]We review a district court's ruling on a defendant's motion for new counsel for abuse of discretion. United States v. Calderon, 127 F.3d 1314, 1343 (11th Cir. 1997).

counsel continuing to represent him." Id.

We reject Alvarado's argument that the district court did not conduct an adequate inquiry about the merits of his motion for substitute counsel. Although not conducting a separate hearing, the district court was fully apprised of the grounds by Alvarado's motion and in his counsel's motion to withdraw. Also, the district court witnessed the relationship between counsel and Alvarado over the course of his trial.

Further, the record does not show the kind of serious breakdown in communication warranting substitute counsel in the sentencing phase. Despite any problems Alvarado and his counsel were having, counsel was able to prepare and file extensive written objections to the PSI. Instead, Alvarado's motion was founded on a general lack of confidence in his counsel's representation, which does not meet the good-cause standard.

Even assuming arguendo that the district court erred, any error was harmless because Alvarado has not shown prejudice in his sentencing. Alvarado argues that his counsel failed to obtain and present exculpatory evidence—primarily potential witnesses who could verify Alvarado's trial testimony—that "probably would have affected the district court's rulings" as to whether Alvarado was entitled to a minor-role reduction, an obstruction-of-justice enhancement and safety-valve

13

relief. However, the district court was bound by the jury's finding of guilt in calculating the guidelines range. Thus, any alleged failure to present evidence of Alvarado's innocence at sentencing did not prejudice him.

## C.    Obstruction-of-Justice Enhancement

Under U.S.S.G. § 3C1.1, a defendant's offense level is increased by two levels if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction . . . ." U.S.S.G. § 3C1.1. One type of conduct that obstructs justice is "committing, suborning, or attempting to suborn perjury." U.S.S.G. § 3C1.1, cmt. n.4; see also United States v. Williams, 627 F.3d 839, 845 (11th Cir. 2010) (concluding that a defendant's trial testimony that is irreconcilable with the evidence credited by the jury constitutes obstruction of justice for purposes of § 3C1.1's enhancement). Perjury occurs when a defendant offers "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94, 113 S. Ct. 1111, 1116 (1993). Where the basis for the obstruction-of-justice enhancement is perjury, "a general finding that an enhancement is warranted suffices if it encompasses all of the factual predicates for a perjury finding."

14

United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002).[4]

Here, the district court's findings that Alvarado's "testimony was not truthful" and "apparently perjurious" were not clearly erroneous. As the district court pointed out, Alvarado's sworn testimony that he knew nothing about the cocaine and talked with Chino only once during the trip directly contradicted Armenta's testimony and the physical evidence, including phone records. In addition, Alvarado's sworn version of events was irreconcilable with the evidence credited by the jury, and thus the district court did not err in imposing the obstruction-of-justice enhancement.

**AFFIRMED.**

---

[4]When a district court imposes an enhancement for obstruction of justice, we review the district court's factual findings for clear error and its application of the guidelines to those facts de novo. United States v. Massey, 443 F.3d 814, 818 (11th Cir. 2006). Where the district court bases an obstruction-of-justice enhancement on perjury, we "accord great deference to the district court's credibility determinations." United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002) (internal quotation marks omitted).